■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILFREDO HOBOT, Appellant. [606 NYS2d 277] —Appeal by the defendant (1) from a judgment of the Supreme Court, Kings County (Marrus, J.), rendered January 29, 1990, convicting him of rape in the first degree (two counts) and sexual abuse in the first degree, upon a jury verdict, and imposing sentence, and (2) by permission, from an order of the same court, dated August 10, 1992, which, after a hearing, denied his motion pursuant to CPL 440.10 to vacate the judgment of conviction.

Ordered that the judgment and the order are affirmed.

The defendant contends, *inter alia,* that the jury's verdict was against the weight of the evidence and that he was denied the effective assistance of counsel at the trial.

The defendant was convicted, after a jury trial, of two counts of rape in the first degree and one count of sexual abuse in the first degree in connection with separate incidents involving encounters between him and the then nine-year-old complainant, the daughter of a woman with whom the defen-

dant was cohabiting. The complainant, who was 11 years old at the time of the trial, testified that on January 7, 1987, she was asleep in her room when, sometime after 9:00 P.M., she was awakened by the defendant, who escorted her to the living room couch. The defendant got on top of her, touched her breast underneath her clothing, and stated that he would shoot her if she told anyone. After pulling down the child's panties, he touched the inside of her vagina with his fingers and his penis. The defendant put his penis inside her vagina and moved up and down. He subsequently fell asleep and the complainant returned to her room. She did not tell anyone about the incident at that time because she feared that the defendant would shoot her and her mother.

The complainant further testified that on May 10, 1987, she attended a Mother's Day party with the defendant and his family. The defendant got drunk at the party and they returned home late. The defendant subsequently woke the complainant and instructed her to go into her mother's bedroom and lie down. The defendant touched her chest, poured beer on his penis and her vagina, and got on top of her and put his penis inside her vagina. The complainant did not tell anyone about the episode because the defendant repeated his threat that he would shoot her if she did so.

Finally, the complainant testified that after midnight on December 11, 1987, the defendant again woke her and took her into the living room. The defendant touched her chest through her clothing, but the complainant repeatedly coughed in an effort to wake her mother, who was home that night. The complainant's mother entered the room and turned on the light. The defendant "moved real fast", and told the mother that the complainant had been coughing. The mother then took the complainant into the bathroom and asked her what had happened. The complainant told her, but the mother advised her not to worry about it because they would be moving soon. On or about December 17, 1987, the complainant stayed at her aunt's house. After the complainant took a shower, her aunt noticed bruises on her body and asked her about them. The complainant explained that her mother had hit her, and she then told her aunt about the foregoing incidents. The complainant was subsequently taken to a police station and to a hospital for a physical examination.

During cross-examination by the defendant's trial counsel, the complainant stated that she did not know if the defendant had put his penis all the way into her vagina, and she admitted that she did not experience any bleeding following

the incident. Her recollection of the dates and of the specific acts committed by the defendant were also challenged on cross-examination.

The prosecution also presented the testimony of Dr. Ardres Jean-Pierre, a physician specializing in the field of obstetrics and gynecology who had been licensed to practice medicine in New York since 1977. Dr. Jean-Pierre stated that he attended annual post-graduate courses of the American College of Obstetrics and Gynecology, one of which dealt with child and adult victims of sexual abuse. He estimated that he had examined 60 to 100 sexual abuse patients since 1979, more than 20 of whom were children. Dr. Jean-Pierre had also testified as an expert in the field of gynecology in more than five previous court proceedings, and he was qualified as an expert in gynecology by the trial court. He testified that on December 21, 1987, he was working at Woodhull Hospital in Brooklyn. At 11:00 P.M., he was called in as a consultant with regard to an examination of the complainant. The child had already undergone a pelvic examination by the attending pediatrician, Dr. Rodriguez, in the emergency room. Dr. Rodriguez had observed a rash in the complainant's vulva area and two tears in her hymen. The tears were located at the two o'clock and five o'clock positions. Dr. Jean-Pierre then performed his own pelvic examination of the child and found redness and irritation of the vulva area as well as two "slight" tears in the hymen which he estimated were each one millimeter in size. He attributed the tears to "previous penetration" by some object, possibly an adult male's penis, and stated that the presence of the tears meant that the hymen was no longer "intact". Since there was no bleeding in the complainant's vagina, Dr. Jean-Pierre found that the tears had not been sustained very recently. However, he could not provide a specific length of time that they had been present, guessing that they could have existed for more than one month or more than one year. Similarly, he found that the child's vaginal rash could have been present for one month or several months. During cross-examination, the doctor admitted that if a penis had "fully entered" the complainant's vagina, her hymen would have been "broken".

The defendant's trial counsel presented testimony which attempted to attack the credibility of the complainant and to provide an alibi for the defendant. The first defense witness was Olga LaLlave, an employee of St. Christopher Foster Care Agency. On August 24, 1989, Ms. LaLlave was present in Family Court and noticed the complainant there with her

brothers and sisters. Ms. LaLlave struck up a conversation with the child and asked her whether she had been sexually abused. The complainant lowered her head and made no eye contact with Ms. LaLlave. She then described a single incident of sexual abuse in which the defendant had touched her body with his hands while she was on the couch. The defendant then got on top of her, but when her mother walked into the room he got off her very quickly and stated to the mother that the complainant was ill. Ms. LaLlave did not know the date of this incident, nor did she ask the complainant about any specific dates. However, she did ask if the defendant had touched her with any other part of his body, and the child responded in the negative. Additionally, the complainant indicated that she had been abused on more than one occasion. The conversation between Ms. LaLlave and the child immediately ceased when the complainant's mother entered the courtroom.

Alibi testimony was elicited from the complainant's mother, the defendant's brother, and the defendant himself. The complainant's mother was also the mother of four children by the defendant and had married him in January 1989. On January 6, 1987, she went to Woodhull Hospital because she was in labor, and returned home three days later. According to the complainant's mother, during that time, the complainant stayed at her grandmother's house, but she came home on January 10.

The complainant's mother further testified that on May 10, 1987, she and most of her family, including the complainant, went to Connecticut. The defendant did not accompany them because he and the complainant's mother had argued that morning. The complainant's mother and the children did not return until 11:00 P.M. or midnight, and she again had an argument with the defendant, who left the house and did not return until 8:00 A.M. on the following morning. However, she admitted that she had been asleep from 2:00 or 3:00 A.M. until 8:00 A.M., and that the defendant had a key to the residence. She further admitted that she wished to reunite her family with the defendant.

The defendant's brother claimed that he stayed overnight at his brother's residence on three nights in January 1987 while the complainant's mother was in the hospital. The defendant left the residence on each of these nights at approximately 9:30 P.M. to go to work. The brother further claimed that he never saw the complainant during that period because she

was staying at her grandmother's house. He admitted that he did not want to see his brother go to jail.

The defendant denied raping or sexually abusing the complainant on any occasion. He stated that on January 7, 1987, the complainant was picked up by her grandmother in the afternoon and stayed at her grandmother's residence until her mother returned from the hospital a few days later. The defendant went to work as a doorman each night and did not return until the following morning. His brother stayed over at the residence on each of the nights. On the morning of May 10, 1987, the defendant and the complainant's mother argued. The mother then left with the complainant and some of the other children for Connecticut. The mother did not return until approximately 11:00 P.M. that night, at which time she and the defendant again argued and the defendant left for work.

The prosecution presented two rebuttal witnesses, one of whom was Orlando C., the brother of the complainant's mother. He stated that he was living at his mother's home during the period of January 4 through January 10, 1987. He further testified that the complainant neither stayed nor lived there during that period.

In his closing argument, the defendant's trial counsel challenged various elements of the prosecution's case, including the complainant's credibility and her powers of recollection. Moreover, counsel focused on the small size of the tears found in the complainant's hymen, contending that these slight injuries were inconsistent with a rape of the child. In this regard, he stated that "I suggest to you, that if what she is telling you, that a grown man got on top of her with force and raped her, that you would have had more than just an [sic] one millimeter tear". Counsel also emphasized alleged inconsistencies in the complainant's testimony and the strength of the alibi evidence presented by the defense.

The jury convicted the defendant of all three counts submitted to it (i.e., two counts of rape in the first degree based on sexual intercourse with a child less than 11 years old, and one count of sexual abuse in the first degree). At sentencing, the defendant presented the court with a *pro se* motion pursuant to CPL 330.30 to set aside the verdict based on ineffective assistance of counsel and newly discovered evidence. He also asked the court to assign new counsel to research and present these arguments. The court agreed to assign new counsel for that purpose. The court further reasoned that the claims

asserted by the defendant would be more appropriately raised in a post-judgment motion to vacate the judgment; hence, it imposed sentence and informed the defendant that it would entertain such a motion in the future.

In January 1992 the defendant, by his present counsel, moved pursuant to CPL 440.10 to set aside the judgment of conviction. He contended, *inter alia,* that the case file contained a document prepared by Dr. Rebecca Acuna, a physician who had examined the complainant on the same date that she was examined by Dr. Jean-Pierre. That document indicated that Dr. Acuna found the complainant's hymen to be "intact" and that the doctor believed that no sexual abuse had occurred. Moreover, the papers submitted in support of the motion contained an affidavit of the defendant's trial counsel, who averred in part as follows: "I did not realize that I had possession of this document until it was brought to my attention by the defendant after the jury had convicted him * * * There was no tactical or strategic reason for not using this material at the trial in the defendant's defense". Accordingly, the defendant maintained that his trial counsel's failure to discover and make use of the document constituted ineffective assistance of counsel. The prosecution opposed the motion, *inter alia,* on the ground that the use of the document at trial would not have had any effect on the outcome of the case.

A hearing was held on the defendant's CPL 440.10 motion on July 6, 1992. Dr. Rebecca Acuna testified that she had been licensed to practice medicine in New York since 1985. In 1987, she was engaged in general practice at a clinic in Brooklyn. She stated that her only training in gynecology consisted of a rotating internship in that field for a portion of a year prior to her graduation from medical school in 1978. On December 21, 1987, the complainant was brought to her by family members based on an allegation of sexual abuse. Dr. Acuna did not regularly conduct gynecological examinations of children and had never before examined a child who claimed to have been sexually abused. She stated that an examination of the vagina could be conducted with the naked eye or with the aid of a device known as a speculum. As Dr. Acuna did not have a speculum small enough to examine the complainant, she conducted "a visual examination of the external genitalia". Based on this visual external examination, she saw no tears in the child's hymen and found "a very small rash in the perineum with intact hymen". She also observed a vaginal discharge which was tested and revealed the presence of

chlamydia, a fungal infection which could be attributable to a variety of causes such as lack of proper hygiene. However, she admitted that the infection could also be sexually transmitted. Finding that the child's vagina was essentially normal, Dr. Acuna told the complainant's relatives that she "more or less" doubted that there was any sexual abuse "as far as penetration is concerned". However, she also told them that she had no expertise in examining children regarding sexual abuse claims and advised them to take the complainant to a hospital emergency room "where there is a gynecologist who can examine the child". Dr. Acuna made this recommendation because she felt "there should be a thorough examination of the child. I believe she should warrant a speculum examination, meaning they will have to look inside the vagina". Dr. Acuna admitted that an experienced gynecologist conducting a speculum examination of the child might detect tears in the hymen which she had not observed.

At the conclusion of oral argument, the Supreme Court denied the defendant's motion to vacate the judgment of conviction. The court noted that Dr. Acuna would not have been permitted to give expert opinion evidence had she been called to testify at the trial because her extremely limited training and experience rendered her unqualified to be an expert witness in the field of gynecology. While the court found that the defendant's trial counsel committed error "in not pursuing this issue based on the medical reports that he had and the notes that he had which were available during the course of the trial", it concluded that "the impact of this doctor's testimony would have been negligible at the trial". The court emphasized Dr. Acuna's admissions that she had no experience in the area of sexual abuse and did not even have the proper instrument to conduct an appropriate examination: "her own actions in this case speak of a doctor who recognized her own limited capabilities and in effect passed this matter to someone else who would be more knowledgeable and more experienced at this kind of difficult examination, and I think that any finder of fact who would hear her testimony * * * would conclude that her words and her actions in this case speak of a doctor who recognized her own limitations and deferred to someone else". The court further observed that "the testimony of Dr. Acuna does not materially help the [d]efendant in this case, in fact, I believe in many respects [it] would have been prejudicial to him. The doctor simply was not a credible witness on an issue that she herself recognized she would not be a credible witness on". Hence, the court

concluded that "I don't believe that any error occurred at the [d]efendant's trial which contributed in any way towards his findings of guilt, and more importantly, I don't believe that had this doctor been called as a witness that the evidence that she had to offer would have created a reasonable doubt in the minds of the jury".

Viewing the trial evidence in the light most favorable to the prosecution, as we must (see, People v Contes, 60 NY2d 620), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, contrary to the contention of the defendant, we find, upon an exhaustive review of the relevant trial testimony outlined above, that the jury's verdict was not against the weight of the evidence (see, CPL 470.15 [5]). Indeed, "weigh[ing] the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People ex rel. MacCracken v Miller, 291 NY 55, 62), we reject any notion that the prosecution's evidence was not of adequate quantity or quality to sustain his conviction or that "the trier of fact * * * failed to give the evidence the weight it should be accorded" (People v Bleakley, 69 NY2d 490, 495).

It is clear from the verdict that the jury, which had the opportunity to view the witnesses, hear their testimony, and observe their demeanor, found the prosecution's witnesses credible and the defendant and his alibi witnesses, including his wife and his brother, not credible. These findings are hardly surprising given the logical, consistent, and unwavering testimony of the complainant, who described the incidents with great detail and with a degree of maturity uncommon for an 11-year-old child. Indeed, her testimony was virtually unshaken and unimpeached.

Although the defense attempted to cast doubt on the complainant's testimony by presenting Olga LaLlave as a witness, that attempt was unsuccessful. It is abundantly clear from a fair reading of Ms. LaLlave's testimony that she discussed the details of only one incident of abuse with the complainant, and that the complainant freely admitted that the defendant did not touch her with his penis at any time during that episode. However, the description of that incident which the complainant gave to Ms. LaLlave fully comports with the child's trial testimony regarding the December 11, 1987, encounter with the defendant, which she stated was interrupted by her mother. Thus, far from impugning the accuracy and believability of the complainant's account, the testimony of

Ms. LaLlave was entirely consistent with the child's version of the events which occurred on that date.

The complainant's testimony was corroborated by the testimony of Dr. Jean-Pierre, an experienced gynecologist who examined the child and found tears in her hymen which were consistent with penetration by the penis of an adult male. While the doctor could not rule out the possibility that the complainant's injuries might be caused by the penetration of the vagina by some other object, it is the rare case when such a conclusive finding can be made. The mere fact that Dr. Jean-Pierre could not state the definitive cause of the tears in the complainant's hymen does not irreparably undermine or detract from his testimony. Furthermore, there was nothing "equivocal" about the doctor's medical findings, nor did they conflict with either the complainant's testimony or the theory of the prosecution's case. Curiously, the dissenters suggest that the strength of the prosecution's case was somehow compromised by Dr. Jean-Pierre's testimony that *full* penetration would have "broken" the complainant's hymen. However, this argument is premised on the faulty assumption that full or complete penetration occurred in this case, an assumption for which there is absolutely no factual support in the record. Indeed, the complainant specifically testified that she did not know if the defendant had put his penis all the way into her vagina, and the injuries discovered by Dr. Jean-Pierre and by Dr. Rodriguez at Woodhull Hospital certainly supported the jury's apparent conclusion that partial penetration had occurred. Moreover, it is well settled that the crime of rape is completed once there is *any* unlawful penetration, "however slight" (Penal Law § 130.00 [1]; *see, People v Liberta,* 64 NY2d 152, *cert denied* 471 US 1020; *see, e.g., People v Brady,* 176 AD2d 743; *People v Townsend,* 148 AD2d 558). Accordingly, it was never suggested in this case that full penetration occurred, and we are perplexed by the suggestions of the defendant and the dissenters which appear to be to the contrary.

In contrast to the consistent and persuasive evidence adduced by the People, the defendant's alibi evidence was far from compelling. It is true that the defendant's wife and brother gave testimony to the effect that the complainant was staying with her grandmother on January 7, 1987, and therefore could not have been abused by the defendant on that date. However, the rebuttal testimony of Orlando C. refuted this assertion, because he was living at the grandmother's home on that date and stated that the complainant did not stay at the residence. Additionally, while both the defendant

and his brother testified that the defendant was working all night as a doorman on January 7, 1987, and May 10, 1987, no work records or similar evidence were submitted to substantiate this claim. Hence, although a tenable defense was presented, we do not share the dissenters' apparent view that this was a particularly close case, nor do we find persuasive the defendant's contention that the quantity and quality of the prosecution's evidence was lacking in some respect. Rather, in light of the strong and consistent testimony presented by the People, the jury's verdict cannot reasonably be characterized as against the weight of the evidence.

The defendant further contends that he was denied the effective assistance of counsel because his trial attorney failed to discover and utilize evidence in the case file regarding the results of Dr. Acuna's examination of the complainant. While we agree with the defendant and the dissenters that trial counsel erred in failing to familiarize himself with this material, we cannot agree that the defendant was denied meaningful representation or was actually prejudiced thereby.

It is firmly established that the right to the effective assistance of counsel encompasses the right to representation by an attorney who has researched and prepared the case to facilitate the presentation of an appropriate defense *(see, People v Droz,* 39 NY2d 457; *People v LaBree,* 34 NY2d 257; *People v Bennett,* 29 NY2d 462). However, claims of ineffective assistance must be evaluated on a case-by-case basis *(see, People v Ellis,* 81 NY2d 854), and "[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met" *(People v Baldi,* 54 NY2d 137, 147; *see, People v Satterfield,* 66 NY2d 796). Here, the defendant contends that Dr. Acuna's findings were diametrically opposed to those made by Dr. Jean-Pierre on the same date, and that Dr. Acuna therefore should have been called to testify regarding her conclusions and to give expert opinion evidence. However, these arguments are clearly refuted by the testimony elicited at the hearing on the defendant's motion to vacate his judgment of conviction. While Dr. Acuna did not observe any tears in the complainant's hymen, this finding was severely compromised by her admissions that she was not a gynecologist, that she had never before examined a child for evidence of sexual abuse, and that in this case she had not performed an internal vaginal examination with the proper instruments. The extremely tentative nature of her conclu-

sions and her conceded lack of experience in this area were further demonstrated by the fact that she referred the complainant to a trained and experienced gynecologist because she believed that a more thorough internal examination with the proper instruments should be conducted. Dr. Acuna further conceded that the performance of such an examination by a gynecologist might well reveal injuries which she was unable to observe. Given this testimony, we agree with the Supreme Court's determinations that Dr. Acuna lacked the requisite qualifications to have testified as an expert in the field of gynecology at the trial, and that any testimony she might have given regarding the examination which she conducted would have been so tentative and equivocal as to be of little or no aid to the defense. Indeed, such testimony might well have proved harmful to the defendant's cause, inasmuch as Dr. Acuna detected a chlamydia infection of the child's vagina, and she stated that such an infection could have been sexually transmitted. Hence, although trial counsel's failure to make use of Dr. Acuna's findings was not a matter of trial strategy, we agree with the determination of the Supreme Court that had counsel been aware of this evidence, he very likely would not have introduced it at trial because of the questionable benefit and great potential for harm which it posed to the defense. Significantly, counsel did skillfully cross-examine Dr. Jean-Pierre at length regarding his medical findings and argued in summation the very point which the dissenters now urge that Dr. Acuna should have been called as a witness to make—i.e., that the physical condition of the complainant was inconsistent with the allegations that she had been penetrated repeatedly. Moreover, the defendant's assertion that trial counsel might have secured an expert witness to interpret and testify regarding Dr. Acuna's examination is entirely speculative and ignores the obvious fact that the doctor simply lacked the experience and instruments to conduct a thorough and proper examination and instead suggested that the child be examined by a gynecologist, who would be more qualified for that purpose. Any expert witness who might possibly have been called by the defense could not have credibly disputed this conclusion.

In light of the foregoing, we find that the defendant has failed to demonstrate that trial counsel's omission "actually had a probable effect on the outcome of the trial" *(People v Daley,* 172 AD2d 619, 621; *see, People v Cuesta,* 177 AD2d 639; *People v Torres,* 164 AD2d 923) so as to support the conclusion that he was denied "meaningful representation" *(People v*

*Baldi, supra,* at 147). Rather, viewing counsel's representation in its totality and in the context of the surrounding circumstances, we conclude that the defendant received effective assistance. Counsel made a cogent opening statement, conducted tenacious and skillful cross-examination, succeeded in procuring the dismissal of numerous counts of sexual abuse against the defendant based on defects in the prosecution's pleadings and proof, presented a tenable (albeit ultimately unavailing) alibi defense, and put forth a logical and well-reasoned summation which emphasized the relative strengths of that defense while challenging the accuracy and credibility of the complainant's testimony *(see, People v Finch,* 199 AD2d 278; *People v Castaneda,* 198 AD2d 292; *People v Lockhart,* 167 AD2d 427). The fact that counsel's efforts on behalf of the defendant proved to be unsuccessful does not render them ineffective, inasmuch as it is well settled that "mere losing tactics" are not to be confused with true ineffective assistance of counsel *(People v Baldi, supra,* at 146; *see, People v Satterfield, supra).* Indeed, the dissenters' conclusion that the evidence in this case presented a close question as to the defendant's guilt stands as a testament to the skills and effectiveness of the defendant's trial counsel, for that conclusion is premised in part upon defense counsel's exposure of the alleged weaknesses in the prosecution's evidence and the purported persuasiveness of the alibi defense prepared and presented by that same counsel. Accordingly, we conclude that the defendant was not deprived of his right to the effective assistance of counsel at the trial, inasmuch as counsel's omission neither deprived him of meaningful representation nor resulted in actual prejudice to the defendant.

We have considered the defendant's remaining contentions and find them to be unpreserved for appellate review or without merit. Mangano, P. J., Sullivan and O'Brien, JJ., concur.

Lawrence, J., dissents and votes to reverse the order, to grant the motion to vacate the judgment of conviction, to order a new trial, and to dismiss as academic the appeal from the judgment on the ground that the judgment has been vacated, in the following memorandum, with which Rosenblatt, J., concurs. I agree with my colleagues in the majority, giving the jury's verdict the "great deference" that we, upon appellate review, must, that the verdict in this case is not against the weight of the credible evidence *(see, People v Bleakley,* 69 NY2d 490, 495). However, in my view the defendant is entitled to vacatur of the judgment of conviction and a

new trial because he was denied his constitutional right to effective assistance of counsel (see, US Const 6th Amend; NY Const, art I, § 6).

As is generally true with cases of this nature, the complainant was the only eyewitness to the alleged attacks upon her. Nine years old at the time that the incidents allegedly occurred, the complainant had apparently initially alleged that the defendant, her mother's husband, had forcibly raped her on eight separate occasions during the year 1987, and the defendant was indicted for eight counts of rape in the first degree based upon use of force, eight counts of rape in the first degree based upon the complainant's age, 50 counts of sexual abuse in the first degree, and endangering the welfare of a child. However, ultimately the defendant was prosecuted only for those counts which related to incidents which allegedly occurred on January 7, May 10 and December 11 (which did not involve allegations of rape), and, due to deficiencies in proof, the only counts which were submitted to the jury related to January 7 and May 10.

The complainant's testimony has been accurately summarized in the majority decision, and will not be repeated here. In addition to that testimony, the People offered the testimony of Ardres Jean-Pierre, the gynecologist who examined the complainant in December of 1987. Referring to the hospital records, Dr. Jean-Pierre testified that there was a rash on the complainant's vulva and tears of the hymen at 2 and 5 o'clock. He characterized the tears as "slight", "probably one millimeter" and comparable in size to the tip of his pinkie fingernail, and he opined that they could have been caused by the insertion of any object into the vagina. Bleeding would have accompanied the tearing that Dr. Jean-Pierre believed to have been present on the complainant's hymen. In contrast, the complainant had testified that she *did not* bleed after her encounters with the defendant. When asked if the tears were consistent with the forcible penetration of an adult erect penis into the vagina of a nine-year-old, Dr. Jean-Pierre responded that "[t]here [was] some penetration. I cannot tell you adult or whatever. I know it was something to penetrate inside. I cannot tell you exactly". However, he acknowledged that if a male erect penis had fully entered the vagina, the hymen would have been broken. Furthermore, Dr. Jean-Pierre indicated that the penetration, whatever its cause, might well have occurred more than one year before his examination, prior to the dates of the alleged incidents.

As part of his case, the defendant established that he did

not have the opportunity to commit the crimes charged, as he and the complainant were not home together on the nights that they allegedly occurred. Specifically, the defendant testified that the complainant stayed at her grandmother's house while the complainant's mother was in the hospital after the birth of their son. At the time the defendant was working nights as a doorman, so his brother stayed at his house at night to care for his infant daughter. This testimony was corroborated by that of the brother and that of the complainant's mother. While the complainant's uncle, who lived with the complainant's grandmother, testified that he did not recall the complainant having stayed at his house, his testimony is of little probative value, as he also did not recall his sister having given birth to his nephew in January 1987.

With regard to the Mother's Day incident, both the defendant and the complainant's mother testified that the complainant accompanied her mother to Connecticut for a family picnic on that day. The defendant remained at home. The complainant's mother did not arrive home until around midnight, causing the defendant to be late for work. The couple fought, and the defendant left the house and did not return until the next morning.

In his defense, the defendant also produced Olga LaLlave, who, in her capacity as an employee of St. Christopher's Foster Care Agency, spoke with the complainant in Family Court in August 1989. At that time, the complainant indicated that the defendant had only touched her with his hands, and with no other part of his body. The discussion was not limited to one encounter.

Despite the somewhat equivocal nature of the medical evidence, which was, at times, at odds with the testimony of the complainant, and the existence of what my colleagues in the majority acknowledge to have been a "tenable" defense, the jury convicted the defendant of the counts submitted to it. Upon his discovery of certain medical records, the defendant made a *pro se* motion to set aside the jury's verdict pursuant to CPL 330.30, and then, upon being provided with new counsel, a motion pursuant to CPL 440.10 to vacate the judgment of conviction, on the ground that he had been denied the effective assistance of counsel.

At the hearing held pursuant to the defendant's post-judgment motion, it was established that on December 21, 1987, four days after the complainant reported the alleged incidents to her aunt, the aunt brought the complainant to a clinic, where the aunt's doctor, Rebecca Acuna, a general practi-

tioner at that time, performed a general examination of the complainant, including the head, neck, chest and abdomen. Dr. Acuna also examined the vagina visually since she did not have a speculum small enough for examining a nine-year-old. She found an "intact hymen", and a small rash, but no "tears". Doctor Acuna told the family that she was "more or less * * * sure" that there was no "sex abuse as far as penetration [was] concerned". Essentially, her findings were "normal". Acuna noted that a one millimeter tear is like an abrasion. In any event, the condition of the hymen, as she saw it, was inconsistent with repeated penetration by an adult male.

Dr. Acuna's findings were antithetical to those of Dr. Jean-Pierre, who testified on behalf of the People at the trial. Taking Dr. Jean-Pierre's testimony alone, it was clear by the end of trial that the medical evidence posed a serious problem to the People's case. It seems, however, that the defendant's attorney was unaware of this crucial flaw until the trial. Evidently, counsel never examined the hospital records containing Doctor Jean-Pierre's findings. In fact, when the records were introduced, trial counsel admitted that he had not seen them, even though they had been disclosed prior to the trial. Moreover, counsel never examined or introduced the even more exculpatory report of Doctor Acuna, let alone presented her as a witness. In an affidavit submitted in support of the defendant's post-judgment motion, trial counsel readily admitted that "I did not realize that I had possession of [Doctor Acuna's report] until it was brought to my attention by the defendant after the jury had convicted him" and further that "[t]here was no tactical or strategic reason for not using this material at the trial in the defendant's defense".

In my view, these omissions deprived the defendant of effective assistance of counsel and caused "actual prejudice". Courts have frequently stated that it is "impossible to formulate a litmus test for 'inadequate' or 'ineffective' legal representation" (People v Ellis, 81 NY2d 854, 856). The appropriate inquiry is whether "the evidence, the law and the circumstances of a particular case, viewed together and as of the time of the representation, reveal that meaningful representation was provided" (People v Satterfield, 66 NY2d 796, 798-799; see also, People v Baldi, 54 NY2d 137, 147). "However it is elementary that the right to effective representation includes the right to assistance by an attorney who has taken the time to review and prepare both the law and the facts relevant to the defense" (People v Droz, 39 NY2d 457, 462). Thus counsel

must " 'conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself time for reflection and preparation for trial' " *(People v Bennett,* 29 NY2d 462, 466).

In the instant case, counsel's failure to examine and utilize the medical evidence in his possession was inexcusable and cannot possibly be attributed to any justifiable trial strategy. Indeed, the majority does not directly dispute that such conduct constituted ineffective representation; the majority merely contends that the defendant was not prejudiced. However, had the defendant's attorney simply read the medical records, he would have realized that there was little, if any, physical evidence corroborating the allegations of repeated rapes. Counsel then could have presented Dr. Acuna, who had been practicing medicine since 1978, and who, at the time of the hearing, was a third-year pediatrics resident, as an expert witness, or at least introduced her findings, and then located an experienced physician to testify about the importance of those findings. Undeniably, Dr. Acuna's report, particularly coupled with the ambiguous and inconsistent findings of Dr. Jean-Pierre, would have prompted a careful attorney to conduct some further investigation *(see, People v Baba-Ali,* 179 AD2d 725, 729). While the majority provides cogent reasons why the trier of fact could have rejected Dr. Acuna's medical findings, as a consequence of the fact that the defendant was deprived of a fundamental constitutional right, the trier of fact was not given the opportunity to evaluate this evidence for itself and draw its own conclusions as to its probative worth. In fact, the prosecutor exploited the defense counsel's failure to call an expert witness in her summation, when, in response to counsel's argument that penetration by an adult erect penis would have caused more damage than a one millimeter tear, she stated that "[d]efense counsel is not a gynecologist with twenty years experience. Doctor John *[sic]* Pierre is".

I must conclude that "[c]ounsel was unprepared and so unfamiliar with the details of the defendant's case 'as to doom the defense to failure' " *(People v Kilstein,* 174 AD2d 756, quoting *People v Angellino,* 91 AD2d 666, 668; *see also, People v Baba-Ali, supra; People v Daley,* 172 AD2d 619).