OPINION OF THE COURT
Melvin L. Schweitzer, J.
Claimant Amine Baba-Ali was wrongfully convicted on charges that he sexually abused his four-year-old daughter, including rape and sodomy. He was imprisoned for over two years — 783 days — on multiple concurrent sentences, the longest of which was for 8V3 to 25 years, primarily in maximum security prisons, before his conviction was reversed on grounds of ineffective assistance of counsel and prosecutorial misconduct (People v Baba-Ali, 179 AD2d 725 [2d Dept 1992]). As prosecutors prepared to re-try him, it was confirmed that the only witness who had presented evidence of such abuse had lied and, in fact, that there was no credible evidence his daughter ever had been molested. The indictment against claimant then was dismissed. He subsequently commenced this action for unjust conviction (Court of Claims Act § 8-b).
Defendant moved pursuant to CPLR 3211 (a) (7) to dismiss for failure to state a cause of action and claimant cross-moved for summary judgment. The Appellate Division, Second Department, granted claimant’s motion for summary judgment, reversing the trial court and finding the State liable (Baba-Ali v State of New York, 20 AD3d 376 [2d Dept 2005]). This was the first time in the history of the unjust conviction statute since it was enacted in 1984 that the Appellate Division, on a motion record, found that claimant had satisfied all requirements of section 8-b — including, of course, his innocence — by clear and convincing evidence without defendant having raised an issue of fact warranting a liability trial. That this appellate court finding was made in a case that did not involve DNA evidence is all the more remarkable. The Appellate Division’s observations pertaining to liability bear repetition as this court turns to the issue of damages here:
“During ‘an extremely unpleasant and highly bitter divorce and custody battle’ (People v Baba-Ali, 179 AD2d 725 [1992]) the claimant was accused by his estranged wife of raping and sexually abusing his *578 then four-year-old daughter. By judgment of the Supreme Court, Queens County (Cooperman, J.), rendered December 5, 1989, the claimant was convicted of two counts of rape in the first degree, two counts of sodomy in the first degree, four counts of sexual abuse in the first degree, two counts of incest, and three counts of endangering the welfare of a child for acts involving his daughter.
“The claimant demonstrated that this Court’s reversal of his conviction was based, in part, on the ground that the judgment was procured by prosecutorial misconduct that was tantamount to fraud (see CPL 440.10 [1] [b]). The prosecutor’s deliberate withholding of evidence which tended to exonerate the claimant constituted a ‘fraudulent act,’ which is ‘[cjonduct involving bad faith, [or] dishonesty’ (Black’s Law Dictionary 687 [8th ed 2004]), as well as a ‘fraud on the court,’ which is ‘a lawyer’s . . . misconduct [in a judicial proceeding] so serious that it undermines . . . the integrity of the proceeding’ (id. at 686). The claimant also demonstrated that the dismissal of the indictment, at the request of the People, was based, in part, on newly-discovered medical evidence (see CPL 440.10 [1] [g]).
“At the claimant’s criminal trial, his daughter did not specifically implicate him, and her pediatrician could not conclude with any degree of medical certainty that she had been sexually abused. The only evidence of his guilt was the testimony of a Dr. Nadine Sabbagh, who found, inter alia, that the claimant’s daughter was missing her hymen. However, this Court noted that her estimation of when the sexual abuse occurred was as consistent with the claimant’s innocence as it was with his guilt. The claimant introduced medical records of two examinations, conducted at the request of the child’s mother about a week after the claimant’s last contact with his daughter and before Dr. Sabbagh’s examination of the child, indicating that no signs of sexual abuse were found and that the child’s hymen was intact. These medical records, when considered in conjunction with a post-conviction medical examination of the child, conducted on behalf of the People, finding no evidence of the sexual abuse reported by Dr. Sabbagh and contradicting her conclusion that the child had no hymen, completely *579 discredited her findings, the only evidence of the claimant’s guilt. In opposition to the claimant’s prima facie showing of entitlement to summary judgment, the defendant failed to raise a triable issue of fact.” (20 AD3d at 377-378 [citations omitted].)
Damages Trial
At trial here, claimant presented testimony and other evidence to document his lost wages; the conditions of his incarceration; the social, emotional and mental impact that conviction and incarceration had on his life; and the loss of his relationship with his daughter.[1]
The court’s findings of fact and conclusions of law follow.
A finding of defendant’s liability having previously been made by summary judgment, claimant is entitled to an award of damages “in such sum of money as the court determines will fairly and reasonably compensate him.” (Court of Claims Act § 8-b [6].) An individual who has been wrongfully convicted and incarcerated and who meets the requirements of the statute is entitled to an award of damages, the amount of which is determined in accordance with “traditional tort and other common-law principles” (Carter v State of New York, 139 Misc 2d 423, 427 [Ct Cl 1988], affd 154 AD2d 642 [2d Dept 1989]). The award is to provide compensation for lost wages, physical or mental problems caused by the incarceration, and pain and suffering, which can encompass the conditions of incarceration (discomfort, fear, lack of privacy), loss of freedom while imprisoned, separation from children, humiliation, interference with personal relationships and damage to reputation (Johnson v State of New York, 155 Misc 2d 537 [Ct Cl 1992]; McLaughlin v State of New York, NYLJ, Oct. 27, 1989, at 25, col 4 [Ct Cl]). The relevant period for determining damages is from the date of conviction to the end of imprisonment, and damages also may be awarded for “any subsequent or continuing damages shown to have proximately resulted from those incurred during said period” (Carter, 139 Misc 2d at 429). Time spent incarcerated prior to conviction cannot serve as a basis for an award (see Fudger v State of New York, 131 AD2d 136, 140-141 [3d Dept 1987], lv denied 70 NY2d 616 [1988]).
The amount of damages, even for claimants that have been incarcerated for similar periods of time, may vary depending on *580 each claimant’s individual circumstances and the course of his imprisonment (Carter v State of New York, 139 Misc 2d 423 [1988], supra). (See discussion infra rejecting defendant’s argument that the court should adhere to a per annum “formula” in making its damages award.) Among the circumstances the court may consider are the stigma attached to the type of conviction, whether the individual previously was incarcerated, the presence or absence of a significant criminal history prior to the unjust conviction and the basis for the prior conviction (a claimant who may not have been guilty of the crime charged but knew he was guilty of something else will suffer less than one who knows he is truly innocent of any wrongdoing) (Johnson v State of New York, 155 Misc 2d 537 [1992], supra; Carter v State of New York, 139 Misc 2d 423 [1988], supra). It is also relevant in this case that “a parent who has been wrongfully deprived of the company of his child, by interference with such custody, association and companionship, may recover damages from the wrongdoer for the mental anguish and wounded feelings and for the expenses incurred in vindicating the parent’s rights to have his child” (McGrady v Rosenbaum, 62 Misc 2d 182, 186-187 [Sup Ct, NY County 1970], affd 37 AD2d 917 [1st Dept 1971], citing Pickle v Page, 252 NY 474 [1930]; McEntee v New York Foundling Hosp., 21 Misc 2d 903 [Sup Ct, Kings County 1959]; Tobin v Grossman, 24 NY2d 609, 619 [1969]; Lisker v City of New York, 72 Misc 2d 85 [Sup Ct, Queens County 1972]).
Pecuniary Damages
Claimant relies on the testimony of his economist, Dr. Miner, to support and then compute his claim to lost wages, past and future, as well as for the computation of his claim for the costs of future psychotherapy. Dr. Miner relied on claimant’s actual earnings from 1986 to 2005, as evidenced by his W-2 forms from 1986 to 2005 and his tax returns prior to 1989. (Exhibit 22.)
In awarding past lost earnings, the court accounts for the actual period of claimant’s confinement from the date of conviction on November 15, 1989 until his release from prison on January 27, 1992, and also adds a subsequent period through 1999 due to claimant’s psychological impairment, that is, for a period when he suffered from the disabling effects of a severe depression which the court finds properly attributable to his unjust conviction/incarceration. The court credits the psychiatric testimony of Dr. Dudley and claimant’s own testimony in this regard.
*581 The court thus finds this period of earnings impairment to be compensable in that it is directly attributable to a depression caused by his conviction, and awards damages for claimant’s past lost earnings capacity amounting to $343,428.[2]
The claim for future lost earnings is another matter, however. A claimant, of course, bears the burden of establishing lost earnings with “reasonable certainty.” (Bielich v Winters, 95 AD2d 750, 750 [1st Dept 1983]; Davis v City of New York, 264 AD2d 379 [2d Dept 1999].) As this applies to future lost earnings, claimant must establish that his future inability to earn at his preconviction/incarceration earning capacity has been proximately caused by those events. (See Bacigalupo v Healthshield, Inc., 231 AD2d 538, 539 [2d Dept 1996] [plaintiff must “establish any diminution in earning capacity result(ed) from his injury”].) Claimant has not met his burden with regard to his alleged diminished future earnings capacity.
Claimant’s pecuniary damages claim also seeks the costs of future psychotherapy for the balance of claimant’s life, predicated on Dr. Dudley’s opinion that claimant would benefit from such treatment. While the court has accepted Dr. Dudley’s view that claimant suffered real psychological issues resulting from his incarceration, the court finds claimant has not proven that the lingering psychological problems claimant now grapples with and which Dr. Dudley opines could be allayed with psychotherapy are primarily attributable to his conviction/ incarceration as to warrant an award of future psychotherapy costs.
Nonpecuniary Damages
The court turns to claimant’s claim for nonpecuniary damages. These are comprised of the damages claimant suffered during his period of incarceration following conviction; and then those he suffered following his release which resulted from his unjust conviction and incarceration. In the first category, the “principal elements” of damages include “loss of reputation,” mental anguish and, above all, the “loss of liberty.” (Reed v State of New York, NYLJ, Nov. 7, 1988, at 24, cols 1, 3 [Ct Cl, claim No. 071650, Oct. 28, 1988, Orlando, J.].) The mental *582 anguish suffered by an inmate while he is in prison encompasses his discomfort, fear, lack of privacy and degradation. It is distinct from the continuing type of emotional damage he may suffer after his release from prison. (Carter v State of New York, 139 Misc 2d 423 [1988], affd 154 AD2d 642 [1989].) In this case, there is also a significant damage component for claimant’s loss of the relationship with his daughter (see cases cited supra).
Mental Anguish/Degradation
Claimant and his wife Lillian both testified as to claimant’s shock and utter disbelief at the moment he was convicted. He never believed it would happen. Disheveled and in tears, “it just destroyed him,” recounted his wife. Having been found guilty, he was carted off to prison. In Campbell v State of New York (186 Misc 586, 590-591 [Ct Cl 1946]), Presiding Judge Barrett described the angst and humiliation suffered by another innocent man thus unjustly incarcerated:[3]
“[C]laimant suffered grieviously during his long term in prison . . . for the commission of crimes of which he was innocent. He was branded as a convict, given a prison number and assigned to a felon’s cell. He was deprived of his liberty and civil rights. He was degraded in the eyes of his fellow men. His mental anguish was great by reason of his separation from society and his wife and family . . . He suffered the miseries of prison life and his confinement was doubly hard because he was innocent.”
Here, claimant stresses the heinous nature of the crimes against his own four-year-old daughter of which he was unjustly convicted: two counts of rape in the first degree, two counts of sodomy in the first degree, four counts of sexual abuse in the first degree, two counts of incest and three counts of endangering the welfare of his own four-year-old daughter. There is no *583 question the nature of this particular conviction further exacerbated claimant’s mental anguish. Claimant explained, for example, that he was thrust into prison as a convicted “tree jumper,” a child rapist, the lowest of low in prison society. He described how he well understood that “[i]f anybody [learned] that there was a tree jumper in the tier ... he wouldn’t make it.” In prison, convicted child molesters were raped or murdered or both, and claimant was acutely aware of what he might face. He was “afraid for his life” from the day he arrived in prison until the day he left. He slept with his head next to the metal toilet in his cell to avoid being attacked from outside the bars. That claimant’s sentence presented this innocent man with the prospect of having to endure 8V3 to 25 years of this mental torture compounded the anguish he was made to experience.
The court also recognizes the toll the heinous nature of these crimes of moral turpitude has taken on claimant’s reputation. See Reed v State of New York (NYLJ, Nov. 7, 1988, at 24, col 1), where Judge Orlando of this court found it “axiomatic” that a claimant unjustly convicted of murder suffered an especially great loss of reputation. As Magistrate Judge Henry Pitman observed in Komlosi v Fudenberg (2000 WL 351414, *15 n 11, 2000 US Dist LEXIS 4237, *49 n 11 [SD NY 2000]):
“The special opprobrium society has for sex offenders is evidenced by New York Corrections Law § 168-c et seq. which requires the registration of sex offenders and public notice of their presence in a community. No similar requirements are applicable to convicted murderers, contract assassins, bombers, robbers, arsonists, burglars, violent muggers or narcotics traffickers who sell drugs to minors.”
Claimant surely is entitled to compensation for the societal degradation he has been made to suffer, of which this statute is emblematic.
Loss of His Daughter
The court takes account of claimant’s tragic loss of the relationship with his daughter, Anna. As her father, claimant enjoyed an extraordinarily loving and close relationship with Anna literally from the day she was born through the first four years of her life. For most of that time claimant was Anna’s primary caregiver as his ex-wife Katherine pursued a college education, and then a demanding career which prevented her from providing the parental care that claimant was in a position to provide to Anna. It was only after the couple’s marital difficul *584 ties ripened into a divorce and custody/visitation battle over Anna that Katherine lodged sexual abuse charges against claimant, inflamed by the hostility of Katherine’s mother. While the decree pertaining to visitation and the order of protection stemming from Katherine’s false charges of child molestation sowed seeds for the potential disintegration of the close father-daughter relationship, it was claimant’s unlawful conviction that extinguished the chance for a resumption of that relationship. As claimant’s wife Lillian testified, claimant’s heart was broken.
Defendant argues that claimant has not proven it was the conviction itself which was primarily responsible for the end of claimant’s relationship with his daughter because it already had been damaged, “perhaps immeasurably and irretrievably, prior to his arrest, let alone conviction.” (Defendant’s post-trial brief at 22.) The court does not agree. At the time Katherine filed for divorce in 1987, she had moved out of the marital residence, leaving Anna behind with claimant. In the fall of 1987, Katherine was awarded temporary custody of Anna pending conclusion of the divorce action. Thereafter, Anna lived in Pennsylvania with her mother and her maternal grandparents and was brought to New York each Saturday morning for weekend visitations with the claimant. Claimant only began to have difficulty with Katherine over these weekend visitations after she tried to prevent him from seeing the child. This forced him to go to court to enforce his weekend visitation rights. Katherine was held in contempt by the court and directed to comply with its prior visitation order. She complied with the court’s directive, but in mid-February 1988 Katherine lodged her sexual abuse accusations. The Supreme Court order which terminated claimant’s visitation rights as of February 25, 1988, did so only until the abuse accusations were resolved. (Exhibit 24.) Claimant next saw Anna when they were together at Dr. Eshkenazi’s office for a court ordered psychological examination on March 10, 1988. There, despite the allegations, Dr. Eshkenazi observed a warm, affectionate relationship between father and daughter, with Anna sitting on her father’s lap. Even after she made some negative statements about him in the doctor’s private interview with her (which the doctor suspected were the product of Katherine’s and the grandmother’s attempts to poison the relationship), Anna stopped in the middle of the interview to go out and hug her father in the hallway. The doctor concluded that he had “serious doubts” Anna had been sexually abused by her father.
*585 The sexual abuse allegations also led to a Family Court proceeding in which an inquest, following claimant’s default when he left the country to visit his sick father, resulted in a Family Court finding that claimant had sexually abused his daughter. This finding, however, was based in large part on the testimony of the same Dr. Sabbagh of the New York City Department of Health who falsely testified at claimant’s criminal trial that Anna had been sexually assaulted. Claimant thus was ordered not to have any contact with Anna until she attained the age of 18. Only after claimant’s criminal conviction was overturned was the doctor’s testimony shown to have been erroneous.
The court concludes it is reasonable to infer that but for claimant’s unjust conviction and imprisonment he would have obtained vacatur of the Family Court’s protection order which had been procured upon his default. The evidence reveals a close and loving father-daughter relationship between claimant and Anna. Although that relationship had been placed in jeopardy by his wife’s malicious allegations of sexual abuse (credited by the Family Court based on Dr. Sabbagh’s false testimony), it was claimant’s conviction and incarceration that shut the door on any chance claimant had to quickly resuscitate it. Anna was still young enough at that point not to have appreciated the import of these erroneous charges nor to have suffered psychological scars from them.
The court also finds it can be reasonably inferred that even after claimant’s wrongful conviction had been overturned, the stigma and lingering doubt the conviction had engendered adversely affected how the New York City Department of Social Services and the court-appointed law guardian both reacted to claimant’s efforts to remove the Family Court’s order of protection. They continued to resist his efforts long after the charges against him were dropped. As a result, according to claimant’s wife, Lillian, all he is left with today are the memories of his close relationship with Anna in her early childhood, and her toys and drawings which remain a fixture in their apartment. The court concludes it is entirely appropriate to view claimant’s loss of his relationship with his daughter as having been proximately caused by his unjust conviction and to include it in determining a fair and reasonable amount of compensation in this case (see cases cited supra with regard to damages for deprivation of the company of a child). The conviction cannot be separated from what has been the tragic loss of that relationship.
*586 Post-Incarceration Psychological Issues
The court next considers whether claimant is entitled to additional damages because he allegedly suffers from post-traumatic stress disorder (PTSD) as a result of his wrongful conviction and imprisonment. Defendant does not contest “that claimant, by whatever diagnosis it is called, suffered after his incarceration, for some time, from psychological readjustment,” but contends that beyond that, any claim to PTSD is unproven. (Defendant’s post-trial brief at 22.)
Claimant’s PTSD claim was presented through the psychiatric expert testimony of Dr. Dudley who had multiple sessions with claimant and prepared reports for the trial in this case and for the earlier trial in the federal court action. He explained that claimant’s certainty that the sexual abuse charges against him would be favorably resolved made the shock following his conviction all the more traumatic for him. The doctor noted that claimant’s fear for his life while in prison due to the nature of his conviction had compounded his trauma. He pointed out how claimant had changed from a socially well-adjusted, outgoing person to one who for the first six months after he was released from prison did not even leave his apartment and became isolated and afraid of crowded places. His sexual relationship with Lillian disintegrated, he had difficulty concentrating and he became afraid of people in uniforms such as the police.
Dr. Dudley concluded claimant had developed chronic (i.e., lasting more than 30 days) PTSD, accompanied by a clinically significant depression. His opinion was based on four criteria set forth in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV): trauma, how a person responds to the trauma, characteristics developed after response to trauma and emotional distress and/or impairment in some area of functioning. Dr. Dudley found claimant’s condition met all four criteria.
Defendant countered that PTSD is “over diagnosed” and “is the whiplash of psychiatric conditions.” (Defendant’s post-trial brief at 26.) Defendant relied on the psychiatric expert testimony of Dr. Nassar. He conducted forensic examinations of claimant in connection with this lawsuit and in the federal court action, and prepared two reports, one in 1996 and the other in 2006. Dr. Nassar opined that claimant does not suffer from PTSD and never has suffered from that condition since his incarceration. He did not find claimant’s incarceration to meet the criteria of “trauma” necessary for a diagnosis of PTSD, *587 principally because the evidence does not show claimant ever perceived of his conviction and incarceration as a threat to his very survival. Claimant was able to cope in prison, as demonstrated by his successful enrollment in the Master’s degree program offered at Sing Sing by the Union Theological Seminary, by his in-prison marriage to Lillian and by using his familiarity with Islam and Arabic to tutor other inmates which provided him with some protection from other prisoners. Dr. Nassar acknowledged the stress of incarceration, but in his view the stress itself does not necessarily result in PTSD. According to the doctor, it is the inability to deal with the stress which causes PTSD, and claimant, to his credit, had the necessary coping mechanisms.
Although on cross-examination Dr. Nassar was shown to be vague and imprecise, and less than thorough and sloppy in recording his examinations of claimant, the court nevertheless concludes that the thrust of his testimony concerning claimant’s ability to cope, both in prison and after his release, militates against a finding that claimant ever has suffered from PTSD. The court notes, however, that Judge Weisberg’s observations in Coakley v State of New York (claim No. 077025, 1994) are particularly apropos to claimant’s psychological situation here. Coakley involved a claimant who was wrongfully convicted of rape and served a sentence of 5V2 years. He claimed he was suffering from PTSD and also presented his claim for this disorder through Dr. Dudley. In Coakley, although the State offered no testimony to counter Dr. Dudley, Judge Weisberg nevertheless concluded: “I need not decide whether claimant’s maladies satisfy the clinical definition of this disorder. The evidence showed, and I find, that claimant was and is suffering from several, if not all, of its symptoms; that they proximately resulted from the conviction and imprisonment; and that they are probably permanent.” The court here finds that the evidence in this case shows claimant has suffered from a number of the symptoms of PTSD, and that these proximately resulted from his unjust conviction.
Loss of Liberty
The Law Revision Commission, in recommending the enactment of section 8-b, stated in its report to the Governor that imprisonment resulting from the unjust conviction of an innocent person is “ ‘the most serious deprivation of individual liberty that a society may impose’ (Livermore, Malmquist & *588 Meehl, On the Justifications for Civil Confinement, 117 U Pa L Rev 75 [1968]).” (Commission Report at 2903.) “[L]iberty is absolute and the loss of it irreplaceable.” (McLaughlin v State of New York, NYLJ, Oct. 27, 1989, at 25, col 4 [Ct Cl, Orlando, J.] [citations omitted].)
The court is asked to include in its damages award the value of what really is an incalculable loss: to place itself within the experience of this claimant and follow his every moment, from the time he heard the “guilty” verdict that extinguished his flame of trust and confidence in a successful outcome born of the certainty of his innocence, to his ensuing despair while incarcerated as a convicted felon in a maximum security prison. At trial, these were claimant’s own words on his loss of liberty:
“You’re stripped of everything that you thought you had on the outside, your civil rights, your name, clothes. You’re housed in confinement, cells. Concrete walls, a bar — barred door in the front. You basically did what they told you to do when they told you to do it. You were no longer a thinking individual anymore. You were just a number. We were housed like animals, basically. ... I couldn’t believe that what was happening to me was real. ... I could — I could not believe that I ended up in a bar — in a cell. . . . Every time you entered or you left the tier, you were stripped [sic] searched. And that entailed stripping off all your clothes, bending over, lifting your testicles, spreading your cheeks, open your mouth. The COs had to look in every orifice of your body to see if there’s any contraband, any blades, any — anything that wasn’t supposed to be there. ... It was done in cattle call ... a dozen of us lined up. They have two or three COs in the back, looking into your butt.”
Upon conviction, claimant was sent to Downstate Correctional Facility for several months and then transferred to Sing Sing where he was confined for the longest part of his incarceration. This five-tier, caged, maximum security prison where he was housed is reserved for the toughest prisoners serving the longest sentences. His cell was six feet by nine feet, three green-painted concrete walls and a fourth of bars. It had only a bed with a thin mattress, a metal toilet two feet from where his head lay when he slept and a metal sink. Even when he was transferred from there to Eastern Correctional Facility he was unable to avail himself there of the more relaxed privilege of *589 conjugal visits with his new wife, Lillian, because he steadfastly refused to comply with the prison’s precondition that he acknowledge responsibility for the crimes of which he had been convicted and did not commit. Whatever measure of human dignity those visits might have afforded thus were also denied him.
While incarcerated, he had been assaulted at Downstate — hit in the face and knocked out — without warning or provocation, by an inmate while they were waiting for a shower. He had to be taken by gurney to a hospital for treatment. At Sing Sing, he lived in constant fear of gang rape and assault in his cell as he had witnessed another inmate repeatedly victimized by this fate while guards stood by without doing anything. He also watched in dread as an inmate was stabbed 50 times with an ice pick (“he had holes like Swiss cheese . . . blood coming out of . . . holes in his body”); and also saw his fellow inmate, several feet away from him, get violently stabbed in the eye while they both waited for their meals (the “guy’s eyeball was hanging down”). He had an overriding fear that he would never get out of prison alive.
In the earlier days of the unjust conviction statute, Judge Adolph C. Orlando of this court eloquently addressed the court’s charge in seeking to quantify the loss of liberty in two decisions:
“How does one place a price on a fundamental birthright? How can this court place itself within the experience of the claimant? How does one feel when handcuffed and shackled and placed in a cell as above described? How can a monetary value be placed on the fleeting hope for freedom; the despair that sets in as the iron bars shut behind one? The unmistakable, unforgettable sound that reverberates throughout one’s very bones. How can one replace the emotional contact of loved ones forever gone?
“No one can really understand the loss of freedom, liberty so unjustly taken from another, ‘Comprendere Non Lo Puo Chi Non Lo Prova.’ [Dante, The Divine Comedy].” (Reed v State of New York, NYLJ, Nov. 7, 1988, at 24, col 3 [citation omitted].)
“We are asked to determine the value of the very things we take for granted; the very things we hold dear; the longings, hopes and aspirations. In short, the very essence for this individual’s existence. It is as if a man’s life has been terminated at one point *590 and then resurrected later; yet with all the intervening traumas, dangers and injuries that will endure, linger and become a permanent part of his life. It is within this set of circumstances that this Court must award damages; stating again that the liberty one so cherishes is absolute and the loss of it a tragedy of incalculable value.” (Ferrer v State of New York, claim No. 74308, filed June 13, 1990.)
The court next turns to this task of placing a monetary amount on the “incalculable,” as well as on the other elements of claimant’s nonpecuniary damages claim.
Valuation of Nonpecuniary Damages
The parties adopt starkly divergent views of how the court should arrive at its nonpecuniary damages award. Defendant computes an average of 10 Court of Claims decisions or settlements it has selected and asserts they evince “a fairly clear cut standard” which it urges the court to apply: “The formula in settlements/verdicts and appellate decisions is a range, generally, of $100,000 to $125,000 per year of incarceration unless there is [sic] significant reasons to deviate (a prior criminal record, a history of assault and injury in prison) either upward or downward.” (Defendant’s post-trial brief at 24.) Claimant, on the other hand, argues there is no such “formula” and stresses the sui generis nature of claimant’s circumstances here, that is, an educated, well adjusted, professionally successful and innocent man who never had been imprisoned and who, to his horror, found himself convicted of the worst imaginable sexual offense against his own four-year-old daughter and given a prison sentence of up to 25 years. Claimant thus urges the court to adopt the “wisdom” of Carter v State of New York (139 Misc 2d at 430) that deemed it inappropriate to apply a flat rate in section 8-b cases “given the variations within and between each individual’s circumstances.”[4]
Claimant also urges the court to begin its valuation with a consideration of the fraudulent and dishonest manner in which *591 he was wrongfully convicted by perjured testimony and the county prosecutor’s deliberate withholding of exculpatory evidence. Claimant “was not simply convicted and imprisoned unjustly — he was lynched,” pleaded his counsel. (Claimant’s mem of law at 34.) It is hard to imagine a worse set of circumstances, as recounted first in the Appellate Division’s reversal of claimant’s conviction and then in its grant of summary judgment on the issue of section 8-b liability. (See People v Baba-Ali, supra; Baba-Ali v State of New York, supra, excerpted.) But the law was not designed to compensate a claimant for a tort actually committed by the State. Rather, the Commission viewed the State as “the most appropriate party to assume liability” for an unjust conviction even if occasioned by a miscarriage of justice at another level of government, such as an elected county District Attorney (Commission Report at 2922). It was the Commission’s view that because a prosecution is brought in the name of the “People of the State of New York,” and the conviction is for an act made criminal by state law “usually with the imprimatur of a state court” (id.), and the convicted person generally is confined in a state correctional facility, the nexus between the State and the entire process justifies the State’s assumption of what it saw as a moral obligation:
“[B]y imposing financial liability upon the State recognition is given to a proposition that would seem to be self-evident, namely that it is the State’s obligation, and no one else’s, to do what justice and morality demand when an innocent person is convicted of a crime he did not commit” (Commission Report at 2923 [citations omitted]).
The Commission emphasized that the vast majority of unjust convictions do not result from prosecutorial misconduct but rather “from human frailties that are ineradicable.” (Commission Report at 2902.) The State’s assumption of liability is thus absolute and prosecutorial misconduct or whatever else brought about the miscarriage of justice is irrelevant. That the State, laudably, has decided to assume this moral obligation regardless of its fault is no basis, however, for it to argue that awards under section 8-b somehow should be less. This, too, has no place in the court’s consideration of its damages award. (See discussion of defendant’s formulaic “standard,” infra.)
The unjust conviction statute gives the Court of Claims wide latitude in arriving at its nonpecuniary damages award to *592 determine what “will fairly and reasonably compensate [claimant]” for an unjust conviction. (Court of Claims Act § 8-b [6].) The Commission expressly rejected the notion that damages should be limited in amount and/or to certain types, that is, only a pecuniary loss which would have excluded any recovery for such items as “pain and suffering, embarrassment and humiliation.” (Commission Report at 2933.) It opted instead for “the traditional legal methods of assessing damages”:
“Imposition of such restrictions [on damages] is simply untenable in the absence of similar limitations [in] actions against the State. New York should not appear to protect or value property rights or personal injuries to a greater extent than the liberty rights of its citizens. Furthermore, imposing restrictions on the amount and type of damages recoverable is simply contrary to the purpose of the claim. The Commission, accordingly, agrees with the general principle stated in Hoffner v. State of New York (207 Misc 1070, 1072 [1955]), a case where damages for unjust conviction were sought:
“The State, by its brief suggest [sic] that more compensatory than money is the apologetic gesture of a penitent society. It seems to the court that such an apology accompanied by a token payment would add a highhanded insult to an almost inconcievable [sic] injury.
“The claimant has been humiliated, degraded, shamed and suffered a loss of reputation and earnings. For this he must be paid, and for this money damages can be compensatory. But all the wealth of the State of New York could not compensate the claimant for the mental anguish suffered through nearly twelve years of false imprisonment, under the impression that he would be there for the rest of his life. How can a man be repaid who has been branded a murderer and whose only hope is an early death to release him from the sentence erroneously passed on him? For this, any award is bound to be a mere token, but it should compensate as well as the medium allows.” (Id.)[5]
*593 The Commission also forthrightly addressed the potential fiscal consequences to the State of this proposal: “In proposing that the State should assume financial responsibility, the Commission is not unmindful of the potential fiscal impact of successful actions upon the State. Indeed, in a particularly egregious case the damages recoverable could be extremely high.” (Id. at 2925 [emphasis added].)
Given the Commission’s clearly expressed intent of what a section 8-b damages award may be comprised, the court finds no place for a formulaic approach to its consideration of damages as defendant urges. No two stories in this area of criminal justice are alike. Each individual on whom has befallen such an injustice is entitled to have the circumstances of his damages evaluated as unique to him. There certainly is no basis to apply a “standard” defendant has divined from its selective citation of 10 damages awards — far less than half of all section 8-b dispositions, that is, verdicts and settlements, since the statute was enacted — seven of the awards in 1989-1998 dollars and none cited with regard to the nonpecuniary damages elements the respective courts specifically addressed in arriving at a decision.* ****[6] Defendant’s theory is altogether unpersuasive. The court has conducted its own search and review of the award and settlement data and the judicial opinions available to it for what the court believes to be all section 8-b award dispositions in the 24- *594 year history of the statute.[7] The majority of the opinions do not *595 in any way purport to employ any such “dollars per year of incarceration” evaluation. On the contrary, most of the decisions the court has been able to review appear to arrive at a nonpecuniary award after expressly confirming consideration of the various factors enumerated by the Commission in its report; some courts expressly reject a formula such as the one urged by defendant here, including Carter v State of New York (supra), one of the cases defendant relies on to support the formulaic standard it argues for.[8]
The court nonetheless is mindful that courts are asked to look to prior awards approved in other, comparable cases in their determination of what is “reasonable compensation.” (See CPLR 5501 [c]; Walsh v Kings Plaza Replacement Serv., 239 AD2d 408 [2d Dept 1997]; Ramos v Ramos, 234 AD2d 439 [2d Dept 1996].) Courts do start with the nature of the crime involved in the conviction and the amount of time incarcerated. But their inquiries hardly end there. And on the fully developed record here — the State’s liability having been determined by the *596 Appellate Division on a summary judgment motion without the necessity for a trial, then a four-day damages trial involving 10 witnesses including four experts — a human tragedy of many facets is revealed which bears slim resemblance to any of the stories the court has been able to review among prior section 8-b decisions. The court thus does not view these prior awards as approaching either in kind or amount what it finds necessary to satisfy the statutory requirement of fair and just compensation for this claimant here.
For claimant’s mental anguish and degradation occasioned by being labeled a convicted child molester of his own four-year-old daughter; for the irretrievable loss of his relationship with his daughter proximately caused by his conviction; for his loss of liberty into the most fearsome maximum security prison environment that an innocent man with no prior criminal history may be thrust; and for the psychological damage claimant sustained following his conviction, both while incarcerated and post-incarceration as a result of all this, the court finds claimant is entitled to $1.75 million in nonpecuniary damages.
In sum, the court awards claimant the following:
Past lost earnings: $343,428.
Nonpecuniary damages: $1,750,000.
The total amount of damages awarded to claimant is $2,093,428.
[Portions of opinion omitted for purposes of publication.]

. Trial record consists of four days of testimony from 10 witnesses including four experts.

. The court uses Dr. Miner’s methodology set forth in exhibit 14 in determining claimant’s lost income for the period from November 15, 1989 through 1999. The court has calculated the income claimant would have earned during that period less what he actually earned as set forth in exhibit 14 to obtain the amount to which claimant is entitled.

. The Campbell claim was one of only five which had been authorized by the enactment of private bills in the State Legislature in the 37 years before the enactment of section 8-b in 1984. (See 1984 Rep of NY Law Rev Commn to Governor on Redress for Innocent Persons Unjustly Convicted and Subsequently Imprisoned, 1984 NY Legis Doc No. 65, reprinted in 1984 McKinney’s Session Laws of NY, at 2899, 2914 [Commission Report].) The private bill enactment in Campbell (L 1946, ch 974, § 2) authorized the Court of Claims to award “damages, including loss of earnings and compensation for the indignities and shame and humiliation and loss of liberty and civil rights and the degradation and loss of reputation and the mental anguish suffered” as a result of the wrongful conviction and imprisonment. (See “Valuation of Nonpecuniary Damages,” infra.)

. He submits, however, that if the court should opt to rely on a formula, it should look to the decision of Judge Sterling Johnson in the U.S. District Court for the Eastern District of New York, Hyatt v United States of Am. (91 CV 0711, July 14, 1997), where, in a Federal Tort Claims Act case for false arrest and false imprisonment which applied Illinois law, the court awarded the plaintiff $3,000 a day for each of the 99 days he was falsely imprisoned ($1.1 million per year) (claimant’s reply mem at 13). In this vein, a more recent case under 42 USC § 1983 involving false imprisonment claims, Limone v United States (497 F Supp 2d 143 [D Mass 2007]), surveyed a number of *591 damages awards and found $1 million for each year of imprisonment to be an appropriate amount.

. The Hoffner decision pertained to a claimant who had served 12 years after having been wrongfully convicted of first degree murder based on an “erroneous and inadequate” eyewitness identification. The conviction was overturned because the District Attorney’s office had suppressed certain evi *593 dence favorable to claimant which existed at the time of trial. The State Legislature had enacted a private bill specifically authorizing the Court of Claims to hear claimant’s damages claim. (L 1955, ch 841.) The statute waived the State’s immunity from liability and consented to a “valid and legal claim against the state” for “damages, including loss of earnings and compensation for the indignities and the shame and humiliation and loss of liberty and civil rights and the degradation and loss of reputation and the mental anguish suffered by claimant as a result of and in connection with his erroneous conviction and imprisonment.” (L 1955, ch 841, § 2.) This statutory language was the same as that adopted by the Legislature in 1946 when it first enacted a private bill for these purposes in the claim of Campbell (L 1946, ch 974). (See Campbell v State of New York, supra; n 3 supra.)

. To come up with its “standard,” defendant apparently divided each damages award by the number of months of incarceration and multiplied the result by 12 to arrive at a per annum amount. Then it averaged the amounts of the 10 awards. This methodology treated each award as if it were a fungible commodity and ignored the differences in kind and amount (both higher and lower) even within defendant’s limited sampling. The actual “per annum” range before averaging, even within defendant’s limited sampling, is $22,000 to $216,000 including two of its own settlements of $156,000 and $166,000. (See settlement data n 7 infra.)

. To the best of the court’s knowledge based on the Clerk’s information and data, there have been 18 adjudicated award dispositions, and 32 settlements of which four occurred after a finding of liability. They are:
Verdicts: Reed v State of New York (NYLJ, Nov. 7, 1988, at 24, col 1 [$450,000 nonpecuniary damages]); Carter v State of New York (139 Misc 2d 423 [1988] [claim No. 073351; $200,000 nonpecuniary damages; express rejection of formula]); McLaughlin v State of New York (claim No. 075123, 1989 [$1.5 million nonpecuniary damages]); Grimaldi v State of New York (claim No. 070838, 1989 [$60,000 nonpecuniary damages]); Reyes v State of New York (claim No. 073249, 1990 [apparent formula, five months’ incarceration, $55,000 nonpecuniary damages]); Ferrer v State of New York (claim No. 074308, 1990 [$1.56 million nonpecuniary damages; settled on appeal $1.2 million]); Smith v State of New York (claim No. 077593, 1990 [$687,500 nonpecuniary damages; settled on appeal, $500,000]); Ivey v State of New York (claim No. 070708, 1991 [$450,000 nonpecuniary damages]); Johnson v State of New York (claim No. 073998, 1992 [$40,000 nonpecuniary damages]); Black v State of New York (claim No. 074203, 1992 [$45,000 nonpecuniary damages; express rejection of formula]); Solomon v State of New York (claim No. 074202, 1992 [$150,000 nonpecuniary damages]); Cleveland v State of New York (claim No. 074204, 1992 [$40,500 nonpecuniary damages; express rejection of formula]); Nieves v State of New York (claim No. 080508, 1993 [$200,000 nonpecuniary damages]); Coakley v State of New York (claim No. 077025, 1994 [$450,000 nonpecuniary damages]); Hoc v State of New York (claim No. 080153, 1995 [apparent formula, 16 months’ incarceration, $125,000 nonpecuniary damages]); Kotler v State of New York (claim No. 086653, 1997 [express adoption formula, 128 months’ incarceration, $1.335 million nonpecuniary damages; also compares its per annum award with two other cases, Carter and McLaughlin, even though Carter expressly rejects formula and McLaughlin does not use one]); Jackson v State of New York (claim No. 084611, 1998 [apparent formula, 35 months’ incarceration, $300,000 nonpecuniary damages]); Ortiz v State of New York (claim No. 096390, 2000 [$500,000 nonpecuniary damages]).
Settlements: Wimes v State of New York (claim No. 079362, 1992 [$6,750]); Chapman v State of New York (claim No. 076806, 1993 [$50,000]); Lumpkins v State of New York (claim No. 079529, 1994 [$15,000]); Mason v State of New York (claim No. 078104, 1994 [$100,000]); Callace v State of New York (claim No. 086694, 1994 [$450,000]); Padgett v State of New York (claim No. 088783, 1995 [$62,500]); Argueta v State of New York (claim No. 091484, 1996 [$15,000]); Langford v State of New York (claim No. 085007, 1997 [$55,000]); McCord v State of New York (claim No. 093656, 2000 [$350,000]); Chalmers v State of New York (claim No. 094177, 2000 [$875,000]); Hobbs v State of New York (claim No. 097082, 2000 [$7,500]); Braunskill v State of New York (claim No. 097685, 2001 [$850,000]); Blake v State of New York (claim No. 099728, 2001 [$1.25 million]); Rojas v State of New York (claim No. 100601, 2001 [$550,000]); Cruz v State of New York (claim No. 085915, 2001 [$150,000]); Jenkins v State of New York (claim No. 101902, 2002 [$2 million]); Lantigua v State of New York (claim No. 099044, 2002 [$300,000]); Crosby v State of New York (claim No. 104028, 2003 [$450,000]); Faison/Sheperd v State of New York (claim No. 104592, 2003 [each $1.65 million]); Warner v State of New York (claim No. 104026, 2003 [$2 million]); Palmer v State of New York (claim No. 105079, 2003 [$17,500]); Burt v State of New York (claim No. 107281, 2005 [$775,000]); Mercer v State of New York (claim No. 108360, 2005 [$800,000]); *595 Scott v State of New York (claim No. 107647, 2006 [$100,000]); O’Donnell v State of New York (claim No. 104340, 2006 [$300,000]); Pichardo v State of New York (claim No. 106211, 2006 [$200,000]); Morales ¡Montalvo v State of New York (claim No. 105766, 2007 [each $1.1 million]); Vera v State of New York (claim No. 102187, 2008 [$640,000]); Harrison v State of New York (claim No. 110386, 2008 [$250,000]); Harris v State of New York (claim No. 105724, 2008 [$3.01 million]); Niver v State of New York (claim No. 106770, 2008 [$12,000]); Brown v State of New York (claim No. 113684, 2009 [$2.6 million]).
There has been no adjudicated damages award since the year 2000, but defendant has entered into 24 settlements since that year ranging from $12,000 to $3 million. Unlike adjudicated awards, a lump-sum settlement does not allow for an analysis of whether the existence of a pecuniary damages claim in a given case may have been significant in arriving at the settlement amount. With this caveat, even applying defendant’s “per annum of incarceration” theory — which the court rejects — to defendant’s own 15 most recent settlements reveals that one third of these dispositions exceed the “standard” defendant urges here by up to 200%.

. In Carter v State of New York (139 Misc 2d at 430), the court said:
“As to defendant’s flat rate argument, per unit damage assessments have not generally been accepted in this State (cf., e.g., 1 PJI2d 629; cf. also, Tate v Colabello, 58 NY2d 84, 88) and, in any event, we deem such inappropriate given the variations within and between each individual’s circumstances and course of imprisonment (cf., e.g., Fisher v State of New York, Ct Cl, Rosetti, J., cl No. 70564, filed Jan. 13, 1986, at 8).”
In Cleveland v State of New York (supra), the court said: “These [nonpecuniaiy] damages are not susceptible to a simple mathematical formula of annualized amounts.” And in Black v State of New York (supra), the court said: “I do not find that damages of this sort can be simplistically reduced to a mathematical formula of annualized amounts.”