■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v AMINE BABA-ALI, Appellant.

In early February 1988 while in the midst of an extremely unpleasant and highly bitter divorce and custody battle, the defendant was accused by his estranged wife, inter alia, of raping and sexually abusing his then four-year-old daughter. His wife had served him with divorce papers in either September or October of 1987 and left the marital residence on November 9, 1987. She was awarded temporary custody of their daughter with the defendant having visitation privileges. The wife moved from the marital residence in Queens into Manhattan. The child was sent by the wife to live with her maternal grandparents in Pennsylvania and the defendant found it necessary to seek enforcement of his visitation rights. Although visitation was to commence sometime around the end of November, the first weekend visit did not occur until December 26 and 27 of 1987. The relationship between the defendant and his wife was extremely acrimonious. They were not on speaking terms.

During the pendency of the divorce and custody proceedings, the defendant's estranged wife accused him of raping her, of taking drugs, and other misconduct, and of physically (not sexually) abusing and neglecting his child. These allega-

tions were never substantiated. Shortly thereafter, the wife accused the defendant of sexually abusing his daughter during weekend visitation.

Given the family's living arrangements at that time, and that the wife had been threatened with sanctions if she did not comply with the visitation order, the wife would drive to Pennsylvania after work on Friday nights and, on Saturdays, drive the child to Queens. The process was repeated on Sunday evenings when the wife would pick the child up and drive her halfway down the New Jersey Turnpike where she would meet the maternal grandparents. The grandparents would then take the child back to their home in Pennsylvania. On February 12, 1988, after six such weekend visits, the grandmother brought the child to her pediatrician, claiming that she suspected the defendant of sexually abusing the child. The last time the defendant saw his daughter alone was on February 7, 1988.

Dr. Daniel O. Dada, the pediatrician who had been the child's doctor when the couple had resided in Pennsylvania, testified for the People at the trial. His examination revealed that the child had a slight rash and a small abrasion at the seven o'clock position on the inside of the wall of her vagina. However, Dr. Dada further testified that the child had had rashes in the past and that he could not conclude with any reasonable degree of medical certainty that the child had been sexually abused. In fact, Dr. Dada opined that the rash and the abrasion could have been caused by any number of things including the child herself. When the child was taken to see Dr. Dada she complained of pressure around her private parts during the night and of itching in the same area. Dr. Dada testified that upon hearing the child's complaints, he immediately suspected a urinary tract infection in her bladder, but admittedly was curious to know whether there was a possibility of sexual abuse.

Dr. Dada's examination of the child's genitalia indicated that the external portions were normal and that there was no swelling. He took a culture and urine sample which revealed the presence of bacteria and the possibility of some contamination. Dr. Dada also observed a pinpointed diffused red rash around the child's vagina which he opined was caused from the irritation that the contamination had caused around the vaginal area. Dr. Dada testified that irritation was the cause of the rash, but he could not state what had caused the irritation.

With respect to the abrasion noted at the seven o'clock

position, Dr. Dada opined that this had to have been caused by a penetrating object, although he could not say with any reasonable degree of medical certainty what this object was. He admitted that it could have been anything from a bath toy to the child's own finger to a man's penis. Since Dr. Dada was unable to perform a comprehensive gynecological examination, he contacted the appropriate authorities and referred the child to Crozer-Chester Medical Center (hereinafter Crozer) for further evaluation.

In sum, Dr. Dada's testimony was inconclusive. He repeatedly stated that the abrasion, the contamination which caused the irritation, and the rash could have had a myriad of causes and he could not say with any reasonable degree of medical certainty that the child had been sexually assaulted.

The following day, the child was taken to Crozer. The medical records from this facility were introduced into evidence by the defendant. The records indicated that the child's genitalia and rectum were normal and that the attending physician had attempted to insert a Q-Tip into the child's vagina but the opening was too small to do so. A notation, "No Signs of SA [sexual abuse]", was made on the record.

The child's mother testified that she was dissatisfied with the examination her daughter received at Crozer and, on February 15, 1988, took her to Children's Hospital of Philadelphia (hereinafter CHOP). Those records were also introduced into evidence by the defendant, and indicated that the child's rectum and genitalia were normal. Next to the boxes marked rectum and genitalia, the attending physician wrote "No external signs of abuse". The CHOP medical records indicated that the child had been examined for roughly an hour and a half. *Significantly and most troubling in this case is the fact that the independent physicians who examined this child at Crozer and CHOP, looking specifically for signs of sexual abuse and apparently not finding any such signs, were not called as witnesses!*

The last time the defendant saw his child, at least in an unsupervised setting, was on February 7, 1988. Subsequent medical examinations took place on February 12, 13, and 15, respectively. Thereafter, some 15 weeks later, on May 26, 1988, the child was examined by another physician, Dr. Nadine Sabbagh. She was referred to this doctor by a detective in the Queens Sex Crimes Squad who was eventually contacted by the child's mother. In the three and a half months between the child's last examination at CHOP and the time Dr. Sab-

bagh saw her, the child had not been taken to see any other physician.

Although the record contains little information as to what transpired in the three and a half months between the child's last examination at CHOP and Dr. Sabbagh's examination, it is clear that following the wife's accusation of sexual abuse, the defendant was not permitted to see his daughter.

Dr. Sabbagh's diagnosis was of sexual abuse with multiple vaginal and anal penetrations. Dr. Sabbagh testified that she had no trouble performing the Q-Tip test and that the child's vagina was abnormally large and her anal muscles abnormally weak, indicating that repeated vaginal and anal penetrations had occurred. The child's anal area was also discolored and had been bruised. The doctor estimated that the sexual abuse had occurred approximately 12 to 18 weeks prior to her examination, plus or minus 4 to 6 weeks.

The doctor's testimony as to the timing of the sexual abuse was not entirely clear. This doctor stated that she believed her initial estimate of 12 to 18 weeks to be correct but she was ethically required to consider a margin of error, the four to six weeks. When cross-examined on this point, she claimed that it was more likely than not that the margin of error should be plus six weeks, but, nonetheless, she was standing by her original estimate of 12 to 18 weeks. Inasmuch as the defendant's last contact with his daughter had occurred 15 weeks prior to the May 26, 1988, examination, the doctor's estimation of when the sexual abuse occurred was as consistent with the defendant's innocence as it was with his guilt.

The child, who was six years old at the time of the trial, testified that she did not hear her father come into her room at night, that she never saw him when the sexual activity was alleged to have occurred, and that she never felt him do anything to her because she was asleep and did not wake up. Despite the numerous ways in which the prosecutor rephrased her questions, the child never specifically implicated her father. She merely stated that she knew something must have happened to her because when she tried to go to the bathroom at her grandmother's house it hurt. In short, the child's testimony was very equivocal. She declined to implicate her father, and despite the various ways in which the prosecutor framed her questions attempting to produce a more definite response, the child repeatedly prefaced her answers with maybes.

We find merit to the defendant's challenge to his judgment

of conviction premised on the claimed ineffective assistance of trial counsel and on the prosecutor's misconduct in withholding the CHOP medical records, which contained potentially exculpatory medical evidence, until the eve of trial.

The circumstances of this case, when viewed in totality, reveal that the defense counsel failed to provide meaningful representation. Counsel was unprepared and so unfamiliar with the details of the defendant's case " 'as to doom the defense to failure' " *(People v Kilstein,* 174 AD2d 756, quoting from *People v Angellino,* 91 AD2d 666, 668).

Approximately nine months before trial, the defense counsel sought enforcement of his discovery demands and the court ordered the People to comply with his request to provide him with the complete set of medical records. However, counsel never followed up and consequently he received the CHOP medical records the day before the trial began. As the trial progressed and counsel had an opportunity to study these records, he realized the importance of the attending physician's testimony. Thereafter, he moved pursuant to CPL 680.20 for authorization to take the deposition of the attending doctor. The court denied the motion which was untimely made, but instructed counsel that he could subpoena the out-of-State doctors if he wished. Nevertheless and despite the court's detailed instruction as to how counsel might secure the attendance of the doctors, counsel did not pursue the matter further. He merely introduced the medical records into evidence. Moreover, *although there were significant inconsistencies in the medical evidence, counsel made no effort to secure independent expert medical testimony.*

While this court is not in a position to second-guess whether a course chosen by the defendant's trial counsel was the best strategy, or even a good one *(see People v Ghee,* 153 AD2d 954), we cannot perceive of any trial strategy which would justify the defense counsel's failure to obtain the attendance of a witness whom he sought to depose pursuant to CPL 680.20 and who had exculpatory information which tended to exonerate the defendant and substantiate his defense. When the representation afforded the defendant is viewed in its totality, and as of the time of the representation, together with the evidence, the law, and the circumstances presented, it is apparent that the defendant was not afforded meaningful representation by counsel *(see, People v Baldi,* 54 NY2d 137).

Finally, we find the People's withholding of the CHOP medical records until the eve of trial inexcusable. Knowing full well that those medical records tended to exonerate the

defendant, the People failed to give them to the defense counsel, even though they were under court order to do so and had had them in their possession for several months. These records were not even presented to the Grand Jury. Had the defendant known of the existence of those medical records well in advance of the trial, as he should have, there is a "reasonable possibility" that the outcome of the trial would have been different *(see People v Vilardi,* 76 NY2d 67, 77). Thompson, J. P., Kunzeman and Lawrence, JJ., concur.

Miller, J., concurs in the result only.