[975 NE2d 475, 951 NYS2d 94]

AMINE BABA-ALI, Appellant-Respondent, v STATE OF NEW YORK, Respondent-Appellant.

Argued May 29, 2012; decided June 28, 2012

**POINTS OF COUNSEL**

*Harris & Panels,* Syracuse *(Michael W. Harris* of counsel), *Bond, Schoeneck & King, PLLC,* Albany *(Carl Rosenbloom* of counsel), and *Law Office of Peter Wessel, PLLC,* New York City *(Peter Wessel* of counsel), for appellant-respondent. I. Under the circumstances of this case, the reduction of nonpecuniary damages to $1,000,000 by the Appellate Division was legally erroneous and an abuse of discretion. *(Harris v State of New York,* 38 AD3d 144; *Carter v State of New York,* 139 Misc 2d 423; *Reed v City of New York,* 304 AD2d 1; *Donlon v City of New York,* 284 AD2d 13.) II. Claimant's uncontradicted evidence in the record conclusively established his claims for past lost earnings and impairment of future earning capacity. *(Thompson v State of New York,* 63 AD3d 825; *Lodato v Greyhawk N. Am., LLC,* 39 AD3d 494; *Walsh v State of New York,* 232 AD2d 939; *Karagiannis v New York State Thruway Auth.,* 187 AD2d 1009; *Hoerner v Chrysler Fin. Co., L.L.C.,* 21 AD3d 1254; *McKay v Ciani,* 288 AD2d 587; *Matter of Commissioner of Social Servs. v Amine B.,* 223 AD2d 703; *Kotler v State of New York,* 255 AD2d 429; *Alferoff v Casagrande,* 122 AD2d 183; *Brock v State of New York,* 77 AD2d 670.)

*Eric T. Scheiderman, Attorney General,* Albany (*Cecelia C. Chang, Barbara D. Underwood, Andrew D. Bing, Alison J. Nathan* and *Robert M. Goldfarb* of counsel), for respondent-appellant. I. The Appellate Division's summary judgment liability determination should be reversed. (*Britt v State of New York,* 260 AD2d 6, 95 NY2d 753; *Leka v State of New York,* 16 AD3d 557; *Tyson v State of New York,* 182 Misc 2d 707, 280 AD2d 934; *Gaidon v Guardian Life Ins. Co. of Am.,* 94 NY2d 330; *Reno v Bull,* 226 NY 546; *Glick & Dolleck v Tri-Pac Export Corp.,* 22 NY2d 439; *Alvarez v Prospect Hosp.,* 68 NY2d 320; *Ferrante v American Lung Assn.,* 90 NY2d 623; *Brunetti v Musallam,* 11 AD3d 280; *United States v Agurs,* 427 US 97.) II. The Appellate Division's damages determinations should not be disturbed. (*Donlon v City of New York,* 284 AD2d 13; *People v Paige,* 16 NY3d 816; *Northern Westchester Professional Park Assoc. v Town of Bedford,* 60 NY2d 492; *Bernardine v City of New York,* 294 NY 361; *Duzon v State of New York,* 244 AD2d 189; *Auer v State of New York,* 289 AD2d 626; *Doe v State of New York,* 189 AD2d 199; *Carter v State of New York,* 139 Misc 2d 423, 154 AD2d 642; *Kotler v State of New York,* 255 AD2d 429.)

**OPINION OF THE COURT**

Chief Judge LIPPMAN.

Claimant in this action to recover for unjust conviction and imprisonment pursuant to section 8-b of the Court of Claims Act was convicted in December 1989, after a nonjury trial, of having committed various sex offenses against his daughter in December 1987 and February 1988 when the child was four years of age. The abuse allegedly occurred during claimant's weekend visits with the child; claimant and the child's mother were at the time estranged and in the middle of acrimonious divorce proceedings.

The most serious of the crimes for which claimant was convicted—rape, incest and sodomy—involved either genital or anal penetration. That element was established before the grand jury and at trial exclusively through the testimony of Dr. Nadine Sabbagh.[1] On examining the child some 3½ months subsequent to the alleged abuse pursuant to a referral by a Queens County Sex Crimes Squad detective, Dr. Sabbagh found numerous signs of anal and vaginal penetration and noted various

---

1. Although the child testified that she felt as if something had happened to her, she did not implicate her father.

genital abnormalities, most prominent among them that the child's hymen was missing. In her trial testimony, she stated repeatedly and emphatically that "there was definitely no hymen," and estimated that the child had been abused within 12 to 18 weeks of her examination "give or take four to six weeks," a period possibly encompassing claimant's weekends with the child the preceding December and February—the last unsupervised visits with his daughter claimant would have.

In January 1992, the Appellate Division, on direct review, reversed claimant's judgment of conviction and ordered a new trial (*see People v Baba-Ali*, 179 AD2d 725 [2d Dept 1992]). The reversal was premised upon the manner in which certain evidently exculpatory evidence had been dealt with, both by the trial prosecutor and defense counsel. That evidence consisted of a report of a full and evidently lengthy medical examination of claimant's daughter conducted by Dr. Daniel Hyman at the Children's Hospital of Philadelphia (CHOP) on February 15, 1988—just over a week after the most recent of the charged sex offenses—specifically to ascertain whether the child had been sexually abused, as her mother and pediatrician suspected.[2] No evidence of abuse was found. Indeed, Dr. Hyman made particular note in the hospital record of the absence of any external sign of abuse in the child's rectal and genital regions. The Appellate Division found that the CHOP records had "not even" been presented by the prosecutor to the grand jury (179 AD2d at 730) and had been inexcusably withheld from defense counsel until the eve of trial, even though they had been ordered to be disclosed and had been in the prosecutor's possession for months (*see id.* at 729-730). The Court found as well that defense counsel had been ineffective for failing timely to seek compliance with the trial court's order directing the People to turn over a complete set of medical records (*see id.* at 729), and for failing, once he had been given the CHOP records, to attempt to secure the testimony of Dr. Hyman or another independent expert (*see id.*). At the same time, however, the Court signaled

---

**2.** The child also was gynecologically examined to rule out sexual abuse two days before at Crozer-Chester Hospital. The records from that exam, which were entirely consistent with the subsequent CHOP exam findings—no signs of abuse having been detected—were turned over to defendant well in advance of trial, but their probative value was significantly compromised by the admittedly cursory quality of the exam, its subject reportedly having been completely uncooperative; the ensuing CHOP exam was performed to assure that the child had been fully evaluated. There is no allegation of prosecutorial misconduct with respect to the Crozer-Chester records.

its understanding that the prejudicial consequence of counsel's ineptitude had been heightened by the cited prosecutorial misconduct: "[h]ad the defendant known of the existence of those medical records well in advance of the trial, as he should have, there is a 'reasonable possibility' that the outcome of the trial would have been different (see People v Vilardi, 76 NY2d 67, 77)" (id. at 730).

The People moved to amend the Appellate Division's decision to delete its prosecutorial misconduct rationale. In submissions by the attorney who handled the matter on appeal and the trial prosecutor, the People stated that the last paragraph of the decision, in which that rationale was set forth, was superfluous and based on factual errors. They said it was not true that the prosecutor withheld the CHOP records from defendant's attorney for months and asserted that the existence of the records had been known to defendant long before the trial. In this connection, the trial prosecutor affirmed that she had turned over the CHOP records shortly after she received them in February 1989, some 10 months before the trial. She acknowledged giving defendant's attorney copies of the records just prior to trial,[3] but explained that she did so because defendant's attorney had misplaced some of the originally turned over documents. The appeals bureau affiant apologetically offered that he may have inadvertently misled the appellate panel by representing that the records had been turned over just before trial; he claimed not to have known at the time of the appeal's briefing and argument that the records had, in addition, been given to defendant months in advance of trial.

Defendant's appellate counsel filed a reply, noting, inter alia, that there was no documentary confirmation (i.e., on the voluntary disclosure form or in the court minutes) that the CHOP records had, in fact, been turned over in February 1989; that, if those records had then been turned over, appellate counsel, who was intimately familiar with the matter having recently handled the People's response to defendant's CPL 440.10 motion, would surely have been aware of it; and that there was reason to suppose that the People were in possession of the CHOP records well before February 1989, since in responding to defendant's motion to dismiss the indictment by reason of the People's failure to present exculpatory evidence to the grand jury, the trial prosecutor did not represent that she did not have the CHOP

---

3. This was the only turnover reflected in the trial transcript.

records and, accordingly, could not present them, but rather urged that the records were not exculpatory.

The motion to amend was denied by the Appellate Division without explanation by order dated March 12, 1992.

Before retrying claimant, the People, in May 1992, had the child reexamined at New York Hospital by Dr. Philip W. Hyden, Director of the hospital's Child Protection Team. He reported that, although there were some genital abnormalities possibly indicative of prior abuse, "the presence of the hymen is in direct conflict with a previous examination [that of Dr. Sabbagh] which indicated its complete absence."[4] Thereafter, the indictment was dismissed on the People's motion.

Following his release from prison, claimant, in May 1993, commenced this action. The State moved to dismiss upon the ground that claimant's wrongful conviction had not been found to have been actionably eventuated. In this connection the State pointed out that section 8-b of the Court of Claims Act would only permit recovery in a situation such as this one, where there had been a reversal and a remand for a new trial, if the claimant's conviction had been reversed and the indictment dismissed on a ground set forth in CPL 440.10 (1) (a), (b), (c), (e) or (g) (Court of Claims Act § 8-b [3] [b]; [5] [b]). It argued that claimant's judgment of conviction was reversed principally on the ground of ineffective assistance of counsel—one not included in section 8-b's enumeration of permissible CPL 440.10 predicates—and that the Appellate Division's other ground for reversal—that there had been a *Brady* violation—also did not correspond to a cognizable section 8-b predicate.[5]

Claimant opposed the State's motion and cross-moved for summary judgment as to liability, arguing that the Appellate Division's reversal along with certain documentary evidence, established that claimant's conviction had been procured by

---

4. As is well known, and as Dr. Hyden in any case explained in an affidavit submitted in this action, hymenal tissue does not regenerate; if the child's hymen was missing at the time of Dr. Sabbagh's examination, it could not have been present at any subsequent examination.

5. Conspicuously omitted as a ground for Court of Claims Act § 8-b recovery is that set forth in CPL 440.10 (1) (h), namely, that "[t]he judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States." Ineffective assistance and *Brady* claims fit within the description of paragraph (h). Reversals based upon noncompliance with pretrial disclosure obligations have also been deemed to fall within the category described by CPL 440.10 (1) (f). But that paragraph too is excluded from the section 8-b enumeration.

prosecutorial misconduct amounting to fraud and thus fell within the description of CPL 440.10 (1) (b), one of the grounds included in the Court of Claims Act § 8-b (3) (b) and (5) (b) enumeration.

The Court of Claims (Nadel, J.) denied the State's motion and claimant's cross motion. It found that the Appellate Division's reversal of claimant's conviction had been, at least in part, for prosecutorial misconduct rising to the level of misrepresentation or fraud. Judge Nadel thus concluded that there was a sufficient reversal predicate for claimant's Court of Claims Act § 8-b claim, at least for purposes of determining whether a viable claim was presented. He, however, denied the cross motion for summary judgment because claimant, as the motion's proponent, had not shown by clear and convincing evidence (*see* Court of Claims Act § 8-b [5] ["In order to obtain a judgment in his favor, claimant must prove (the elements of his or her claim) by clear and convincing evidence"]) the absence of triable issues respecting the State's liability.

The Appellate Division in the decision and order now principally at issue affirmed the denial of the State's motion to dismiss but reversed the denial of claimant's cross motion, awarding claimant summary judgment upon the issue of liability (20 AD3d 376 [2d Dept 2005]). The Court agreed with claimant (and the Court of Claims) that its reversal of the judgment of conviction was premised, at least in part, upon prosecutorial misconduct amounting to fraud. Unlike the Court of Claims, however, the Appellate Division found no residual factual question as to whether there had been fraud by the prosecutor, or as to whether the other elements of claimant's Court of Claims Act § 8-b claim had been established by clear and convincing evidence (*id.* at 377-378). It said:

> "The prosecutor's deliberate withholding of evidence which tended to exonerate the claimant constituted a 'fraudulent act,' which is '[c]onduct involving bad faith, [or] dishonesty,' (Black's Law Dictionary 687 [8th ed 2004]), as well as a 'fraud on the court,' which is 'a lawyer's . . . misconduct [in a judicial proceeding] so serious that it undermines . . . the integrity of the proceeding' (*id.* at 686)" (20 AD3d at 377).

After a trial on the issue of damages, the Court of Claims awarded claimant nonpecuniary damages in the amount of

$1,750,000 and $343,428 in past lost earnings (24 Misc 3d 576 [2009]). No award for loss of future earnings was made. On the ensuing appeal by the State and cross appeal by claimant, the Appellate Division modified solely to reduce the nonpecuniary damage award to $1 million (76 AD3d 940 [2d Dept 2010]).

The present appeals followed, pursuant to leave grants by this Court. Defendant State now challenges the liability finding made on summary judgment by the Appellate Division and, moreover, urges that its motion to dismiss the claim should have been granted. Claimant challenges the Court of Claims' damage awards, both as affirmed and as modified by the Appellate Division: he maintains that the award for past lost earnings was inadequate, that the denial of an award for future loss of earnings was in error, and that the Appellate Division's reduction of the award for nonpecuniary damages was unjustified. We modify to deny claimant's motion for summary judgment as to liability, and otherwise affirm.

It is, to begin, clear that the criminal case against claimant was deeply and irredeemably flawed. The CHOP records, properly understood, exculpated claimant. As Dr. Daniel Hyman would later set forth more comprehensively in affidavit form,[6] those records documented his examination of the child at CHOP on February 15, 1988 specifically for the purpose of ruling out recent sexual abuse. No injury or abuse of any kind was detected. After exhaustively detailing the procedures followed during his full examination and his negative abuse findings— including most notably that the child had an intact hymen—Dr. Hyman stated,

> "In my opinion, with[in] a reasonable degree of medical certainty, there was no physical examination evidence that [the child] was raped or sodomized as of the date of my examination of [the child] on February 15, 1988; assuming the accuracy of the records of Dr. Sabbagh, there was evidence to substantiate the further conclusion that [the child] was raped, sodomized or otherwise sexually abused sometime after February 15, 1988.
>
> "[ ] If Mr. Amine Baba-Ali was convicted for having on February 6-7, 1988 and December 25-26, 1987

---

**6.** This affidavit was obtained by defendant and submitted in support of his CPL 440.10 motion for post-conviction relief.

caused the injuries to his daughter that resulted in the abnormalities observed by Dr. Sabbagh during her May 26, 1988 examination of [the child] then a terrible injustice has occurred because Mr. Baba-Ali was convicted for having committed crimes that occurred after, not before, the date of my examination."[7]

According to Dr. Hyman, he was never contacted about the matter by the office of the Queens District Attorney and spoke only once (i.e., without any follow-up) to a criminal defense attorney.

The Appellate Division in the decision and order we now review plainly and reasonably attributed the underlying prosecution's miscarriage to the late introduction of the exculpatory CHOP records into the criminal proceeding's evidentiary calculus. And, indeed, it should involve no supposition to conclude that had those records timely been accorded the attention they deserved, there would have been no indictment, much less a conviction.

It is true that the Appellate Division premised its reversal of claimant's conviction on findings that claimant had been denied effective assistance of counsel and that there had been a *Brady* violation, and that neither of those grounds for reversal itself qualifies as a predicate for a Court of Claims Act § 8-b claim (*see supra* at 633 n 5). It is, however, also true that, as Judge Nadel noted, the Appellate Division, even while not considering the matter in a CPL 440.10 context, identified, in addition to those non-actionable constitutional violations, an element of prosecutorial misconduct going well beyond a simple *Brady* violation—one consistent with the sort of misrepresentation and fraud described by CPL 440.10 (1) (b). There is no dispute that if claimant's conviction was reversed and the indictment dismissed upon the ground that the conviction was procured by misrepresentation or fraud within the meaning of CPL 440.10 (1) (b), there exists a Court of Claims Act § 8-b (3) (b) predicate for the present action.

In support of its motion to dismiss, the State contends that the Appellate Division did not actually premise its reversal on prosecutorial misconduct. The decision itself, however, reads to

---

7. Dr. Hyman's assumption that Dr. Sabbagh's report had been accurate would prove generous. As noted, her abuse findings—the only such findings in the case—were completely discredited by the authoritative independent examination report of Dr. Hyden, finally obtained by the People after the by then 2½-year-old conviction had been reversed on appeal.

the contrary,[8] and the Appellate Division's denial of the People's motion to amend its decision to delete as unnecessary its discussion of the prosecutor's lengthy and purposeful withholding of the potentially exculpatory CHOP records, suggests, at the very least, that the Court did not view the objected to language as dispensable or tangential. The Court's subsequent gloss of its decision of the criminal appeal in the decision we now review, where it explicitly found that the prosecutor's deliberate withholding of exculpatory material amounted to a fraud on the court within the description of CPL 440.10 (1) (b) (see 20 AD3d at 377), would seem to be authoritative, at least as to whether that same Court had intended fraud to be a ground for reversing the subject judgment of conviction. Whether the Appellate Division was correct in folding prosecutorial fraud into its rationale for reversal and deeming fraud to have been established as a matter of law is another question. For purposes of presenting a claim pursuant to Court of Claims Act § 8-b (3) (b), it is sufficient that there is documentary evidence to place the claim within one of the allowed CPL 440.10 predicates. That requirement was met here by the Appellate Division's decisions.

The State's more substantial argument for dismissal of the claim is that, even if there was misrepresentation by the prosecutor, claimant will be unable to show, as he must to recover, that that was the procuring cause of his conviction (see Court of Claims Act § 8-b [5] [b] and CPL 440.10 [1] [b]). The State argues that any claim that nondisclosure operated to procure the verdict must be defeated by the circumstance that the CHOP records were in the end disclosed, even if belatedly, and placed in evidence for consideration by the factfinder. We cannot agree, however, that an eleventh hour turnover would invariably so neatly sever the causal link between prolonged suppression of exculpatory evidence and a guilty verdict. Here, the Appellate Division found, and we agree, that had the records been turned over well in advance of trial a different outcome would have been reasonably possible. Indeed, if the significance of the records had been properly conveyed and understood, an acquittal would have been the only rational outcome.

---

**8.** Indeed, the decision states in so many words, "We find merit to the defendant's challenge to his judgment of conviction premised on the claimed ineffective assistance of trial counsel *and on the prosecutor's misconduct in withholding the CHOP medical records*, which contained potentially exculpatory medical evidence, until the eve of trial" (*People v Baba-Ali*, 179 AD2d at 728-729 [emphasis added]).

The CHOP records, although facially reflective of a full physical examination that disclosed no signs of abuse, consisted of hospital forms filled out with check marks and brief notations; the records contained no narrative account of the examination or of the examiner's findings. While the presence of an intact hymen was inferable from the notation that there were "no external signs of [rectal or genital] abuse,"[9] there was no express statement specifically noting an extant hymen. The records, then, required some expert explanation if the full significance of the documented examination was effectively to be communicated to the factfinder. Any suppression of these uniquely probative documents[10] that functioned to diminish their exculpatory utility may in this highly sensitive context have been a procuring cause of claimant's wrongful conviction.

██ Even with defense counsel's representational shortcomings, the possibility cannot now be excluded that he would have realized the very considerable exculpatory potential of the CHOP records, if they had been turned over to him in timely fashion. Counsel plainly recognized that the records were exculpatory; his efforts to make use of them although clumsy and ineffective when they took place, might well have been significantly more efficacious had they been undertaken months before. The relation between counsel's ineffectiveness, any disclosure delay and the verdict is factually complex. We do not think it possible to determine as a matter of law that the wrongful verdict against claimant was properly attributable solely to counsel's inadequate representation, and concomitantly that it was not also significantly and actionably procured by the alleged prosecutorial misconduct. Whether there was procuring fraud is on this record an issue for the factfinder. This brings us somewhat anticipatorily to the question of whether the Appellate Division's grant of summary judgment to claimant on the issue of liability was proper.

Although there is evidence in the present record to support the imposition of liability on a procuring fraud theory—

---

**9.** Although the trial court and prosecutor made much of this notation's use of the term "external," it is clear from the expert affidavits now of record, including that of Dr. Hyman, that an external gynecological exam involves, inter alia, visualization of the hymen.

**10.** As noted there was no other complete pelvic examination of the child proximate to the dates of the alleged abuse. The evidence of the exam was critically important particularly where the People, although aware of the earlier exam, had elected to rely on an exam conducted months later that purported to disclose abuse of highly uncertain vintage.

evidence from which it might be reasonably inferred that, as the Appellate Division found, the trial prosecutor deliberately suppressed the CHOP records until the eve of trial, and by thus frustrating defendant's use of the records induced the conviction of an innocent man—the question immediately before us is whether, solely on such evidence, the Appellate Division's grant of summary judgment as to liability was proper. We cannot conclude that it was. The submissions placed before the court in support of the summary judgment motion in their more complete aspect raise triable issues, not only as to whether any withholding of the exculpatory records was, in fact, the procuring cause of claimant's conviction, but also as to the timing of the disclosure of those records and the intent of the prosecutor. A grant of summary judgment must be based on evidence "sufficient . . . to demonstrate the absence of any material issues of fact" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]). That standard is not met here.

While, in considering defendant's motion to dismiss claimant's Court of Claims Act § 8-b claim it was appropriate to assume the truth of claimant's documented allegations, in now considering claimant's summary judgment motion that assumption must give way; the question is not simply whether claimant has a claim, but whether he has by his submissions actually clearly and convincingly proved one.

The issue of fraud in the underlying prosecution, although adequately presented, has not yet been conclusively litigated. While the Appellate Division in looking back at its decision reversing claimant's conviction apparently understood the issue to have been decided, if it was decided, it was only upon the apparent concession of the attorney who handled the appeal for the People to the effect that the CHOP records had not been turned over until just before the trial.[11] As the submissions on the motion to amend from dehors the appellate record showed, however, the pivotal factual question of the disclosure's timing was actually closely disputed and presented sharply defined credibility issues. The Appellate Division's denial of the motion to amend did not and could not properly resolve that triable question; the denial, correctly understood, represented no more than an exercise of discretion as to whether there had been a

---

11. There would have been no other basis for the Court's fixing of the turnover date since the Court was careful to note in its decision's decretal paragraph that "[n]o questions of fact have been raised or considered" (*People v Baba-Ali*, 179 AD2d at 725).

sufficient reason advanced for the Court to take the extraordinary step of making a very significant substantive excision from a decision which, in its relevant parts, fairly reflected representations previously made by the party seeking the change. However appropriate that denial may have been within the immediate context of the criminal appeal, it should not be accorded broader preclusive effect. The People's appellate concession should not now be collaterally binding as against the State in its defense of the present Court of Claims Act § 8-b claim. Proof of a matter, particularly one as serious as prosecutorial fraud, cannot be clear and convincing if it is not shown to be actually rooted in the facts, but is instead based in essential part solely on an attorney's second-hand impression of the facts. If it is found, as the trial prosecutor repeatedly represented during the criminal proceedings in opposing the assertedly belated efforts of claimant's attorney to use the CHOP documents, that the disputed exculpatory materials were turned over to claimant in February 1989, months in advance of the trial, there can be no tenable claim of fraud. If, however, it is found that the records were, in fact, withheld until the eve of trial, the fraud claim will be viable but will require for its determination the resolution of other material factual issues, namely, whether the prosecutor's withholding of the exculpatory material amounted to a "deliberate tactical concealment" (*see Leka v Portuondo*, 257 F3d 89, 103 [2d Cir 2001]), and, as discussed above, whether the wrongful conviction was procured by the withholding. The Appellate Division was not wrong to think on its review of the record that claimant could prove even these unusually exacting elements of his fraud claim, it erred only to the extent that it held he did.

■■ Turning finally to claimant's appeal, the predominantly factual issues presented are for the most part unreviewable in this Court. Indeed, where, as here, the Appellate Division reviews a judgment after a nonjury trial it has virtually plenary power to "render the judgment it finds warranted by the facts" (*Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983]). We perceive no basis to conclude that the Appellate Division exceeded that power in reducing claimant's nonpecuniary damage award as it did. Claimant's challenge to the adequacy of the award for lost earnings is simply an assertion that the affirmed facts, fairly interpreted, warranted a larger recovery. That is not a claim we can pass upon. Last, while claimant raises a legal issue when he argues

that the Court of Claims applied the wrong standard in rejecting his claim for loss of future earnings, the argument is without merit. The court properly required claimant to prove his entitlement to such damages "by a reasonable certainty" (*see Shubbuck v Conners*, 15 NY3d 871, 872 [2010]). The court's conclusion that he had not done so was premised on its record based factual findings which, as affirmed, are beyond our review (*see Cannon v Putnam*, 76 NY2d 644, 651 [1990]).

Accordingly, the order of the Appellate Division should be modified, without costs, by denying claimant's motion for summary judgment on the issue of liability and remitting to the Court of Claims for further proceedings in accordance with this opinion and, as so modified, affirmed.

Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur; Judge READ taking no part.

Order modified, etc.