Matter of County of Warren (2020 NY Slip Op 02217)





Matter of County of Warren


2020 NY Slip Op 02217


Decided on April 9, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 9, 2020

527673

[*1]In the Matter of the Acquisition of Real Property by the County of Warren. Forest Enterprises Management, Inc., Appellant; County of Warren, Respondent.

Calendar Date: February 20, 2020

Before: Clark, J.P., Mulvey, Aarons, Pritzker and Reynolds Fitzgerald, JJ.


E. Stewart Jones Hacker Murphy LLP, Latham (Patrick L. Seely Jr., of counsel), for appellant.
Mary Elizabeth Kissane, County Attorney, Lake George (Ryan J. Dickey of counsel), for respondent.



Pritzker, J.
Appeal from a judgment of the Supreme Court (Muller, J.), entered August 16, 2018 in Warren County, which, in a proceeding pursuant to EDPL article 5, determined the compensation due claimant as a result of the acquisition of real property.
Claimant is a land development company that owns a parcel of undeveloped real property located in the Town of Queensbury, Warren County. The property is located near the junction of Quaker Road and Quaker Ridge Boulevard and is just south of the Floyd Bennett Memorial Airport. The property is divided into various tax parcels — 12.9 acres of which are south of a National Grid overhead power line that traverses the property (hereinafter the southern parcel) and 84.58 acres of which are north of the power line (hereinafter the northern parcel) — the total acreage of which is 97.48 acres. Claimant has a 200-foot right-of-way below the power line. The southern parcel fronts onto Quaker Road and the northern parcel is accessed by Quaker Ridge Boulevard, a street that ends at a retained right-of-way that goes over and through a parcel sold by claimant to Walmart (hereinafter the Walmart parcel). After receiving a grant to develop a technological park in 2006, claimant entered into discussions about developing the property and undertook various studies in preparation to do so. In 2012, before the property was developed, respondent appropriated approximately 3.86 acres of the northern parcel via eminent domain in order to preserve the airport's runway protection zone. Additionally, respondent established an avigation easement over the remaining 80.72 acres of the northern parcel. The easement does not extend to the southern parcel. Pursuant to an April 2015 stipulation and order, respondent paid claimant $327,200 as just compensation for the property acquired.[FN1] Claimant reserved its right to file a claim for damages.
In September 2015, claimant commenced this proceeding pursuant to EDPL article 5 by filing a verified claim to recover further damages. Experts for both claimant and respondent conducted separate appraisals of the property to determine its unencumbered value and the diminution of value caused by both the taking and the easement; respondent's appraiser also prepared a rebuttal to claimant's appraisal. As relevant to this appeal, claimant's expert appraised the entire 97.48 acres of the property under the theory that the entire property was affected by the taking and easement. By contrast, respondent's expert only appraised the northern parcel, omitting the 12.9-acre southern parcel. Following a trial, during which Supreme Court dismissed claimant's expert testimony in its entirety, the court set damages in the amount of $297,000, solely relying on the testimony of respondent's expert. Claimant appeals.
"When private property is appropriated for public use, just compensation must be paid, which requires that the owner be placed in the financial position that he or she would have occupied had the property not been taken" (Matter of State of New York [KKS Props., LLC], 119 AD3d 1033, 1034 [2014] [citations omitted]; see Matter of Eagle Cr. Land Resources, LLC [Woodstone Lake Dev., LLC], 149 AD3d 1324, 1325 [2017], lv denied 29 NY3d 916 [2017]). "Upon a partial taking of real property, an owner is not only entitled to the value of the land taken — i.e., direct damages — but also to consequential damages, which consist of the diminution in value of the owner's remaining land as a result of the taking or the use of the property taken" (Matter of State of New York [KKS Props., LLC], 119 AD3d at 1034 [citations omitted]; see Matter of Eagle Cr. Land Resources, LLC [Woodstone Lake Dev., LLC], 149 AD3d at 1326). "Damages must be measured based upon the fair market value of the property as if it were being put to its highest and best use on the date of the appropriation, whether or not the property was being used in such manner at that time" (Matter of State of New York [KKS Props., LLC], 119 AD3d at 1034 [citations omitted]; see Matter of Eagle Cr. Land Resources, LLC [Woodstone Lake Dev., LLC], 149 AD3d at 1325-1326).
We turn first to claimant's contention that Supreme Court erred by failing to consider all 97.48 acres of the property as a single parcel. We agree. "In order to treat different parcels . . . as one tract for the purpose of assessing severance damages incident to an appropriation, there must be (1) contiguity, (2) unity of use and (3) unity of title or ownership" (Erly Realty Dev. v State of New York, 43 AD2d 301, 303-304 [1974] [citation omitted], lv denied 34 NY2d 515 [1974]; see Matter of County of Suffolk [C. J. Van Bourgondien, Inc.], 47 NY2d 507, 514 [1979]; Tehan's Catalog Showrooms, Inc. v State of New York, 118 AD3d 1497, 1497-1498 [2014], lv denied 24 NY3d 913 [2015]). Here, respondent concedes that the element of unity of ownership is not at issue; therefore we need only examine contiguity and unity of use. Contiguity will be found between parcels when they are "adjacent and lack[] any physical boundary . . . [and are] capable of being traversed" (Erly Realty Dev. v State of New York, 43 AD2d at 304). "A public highway actually traveled . . . running through a large tract devoted to one purpose does not necessarily divide it into independent parcels, provided the owner has the legal right to cross the intervening strip of land" (id. [internal quotation marks and citations omitted]; see Matter of City of New York, 55 AD2d 615, 616-617 [1976], affd 44 NY2d 965 [1978]). Given the adjacent nature of the parcels and that claimant has a 200-foot right-of-way to cross the power line fee,[FN2] we find that the parcels meet the element of contiguity (see Matter of City of New York, 55 AD2d at 616-617; Erly Realty Dev. v State of New York, 43 AD2d at 304).
Unity of use will be found when there is "testimony that [the] claimant[] intended to develop the entire tract for commercial purposes and that it had been assessed on the tax rolls in one entry solely in the name of the corporation . . . [, rather than] a situation where unrelated uses were going on side by side on contiguous parcels" (Erly Realty Dev. v State of New York, 43 AD2d at 304). Unity of use will also be found if the record contains evidence that negotiations were culminating towards development of the whole property before the taking, or when the record shows that engineers have evaluated the entire site for development rather than constituent parcels (see Matter of Village of Port Chester [Bologna], 95 AD3d 895, 896-897 [2012], lv denied 20 NY3d 852 [2012]; 90 Front St. Assoc., LLC v State of New York, 79 AD3d 708, 710 [2010]). To find unity of use, there must be a "reasonable probability that its asserted use could or would have been made within the reasonably near future; and a use which is no more than a speculative or hypothetical arrangement in the mind of the claimant may not be accepted as the basis for an award" (Matter of City of New York [Broadway Cary Corp.], 34 NY2d 535, 536 [1974] [internal quotation marks and citations omitted]).
At trial, Victor Macri, the former president and chief operating officer of claimant, described the property, explaining that when it was acquired by a company that preceded respondent, it was part of a roughly 800-acre parcel. Although parts of the entire property had been alienated and sold prior to this proceeding — the Walmart parcel, for example — Macri described the entire property as a contiguous piece of property. Macri testified that "[t]he unique thing about this property was [its large] contiguous acreage that could support an industrial development" and repeatedly referred to the property as "contiguous" throughout his testimony. He explained that the plan for the property was to have a "mixed-use development . . . [w]here an employee can go and have all of the services they need and never have to leave the campus." To accomplish that, the southern parcel would be retail/commercial development and the northern parcel would be light industrial development, both of which were permissible uses. Claimant's expert, Kenneth Gardner, a professional real estate appraiser who has experience in airport and avigation easements, testified that, in appraising the property, he initially focused on the northern parcel, but, as negotiations for development went on, it became apparent that the entire property was involved in a large development plan. Certain plans and proposals for the development of the property were "campus concept" featuring "multiple access roads across the transmission line easement." As such, Gardner testified that he valuated the entire property as one parcel.
Respondent's expert, Todd Thurston, a professional real estate appraiser who also has experience in avigation easements, testified regarding his appraisal of the property. Thurston explained that, although typically the ability to cross would satisfy the prong of contiguity, in this particular case, the northern parcel and the southern parcel have always been considered different and independent projects. On cross-examination, Thurston testified that he did not consider the southern parcel in his valuation of the property. Also, Thurston admitted that he did not know if the two parcels had ever been conveyed separately, admitted that claimant does not need a right-of-way to cross its own property and could not answer whether there is a document formally granting this right-of-way from National Grid. Thurston described "contention" between Macri and the Town of Queensbury over a secondary access road to the property,[FN3] a condition that the Town was requiring in order to approve subdivision of the northern parcel, which eventually ended in September 2012 when Macri agreed to build a road to the Town's specifications.[FN4] However, the development of the project ceased thereafter, and, when asked why this was the case, Thurston intimated that it was due to the condemnation.
After hearing the testimony, Supreme Court held that Gardner's valuation was "not based upon sound hypothesis" and rejected it, instead crediting Thurston wholly on his finding that the highest and best use of the northern parcel is as an unconnected and independent economic unit. This was error. The record contains significant evidence that the campus concept was claimant's ultimate plan for the property. Although there was testimony about the need for the secondary access road, the record is devoid of proof that claimant's development failed because of this. In fact, the record reveals that respondent had agreed to provide an easement, at which time claimant agreed to build a secondary access road to the Town's specifications.[FN5] Even Thurston conceded in his testimony that this road would be built.
Given the foregoing evidence, claimant's planned development, which included retail on the southern parcel and a technology park on the northern parcel, was not merely a "prospective use existing only in the mind's eye of [claimant] or based upon claimant's history as a developer" (Triple Cities Shopping Ctr. v State of New York, 26 AD2d 744, 745 [1966] [internal quotation marks and citation omitted], affd 22 NY2d 683 [1968]; compare Matter of City of New York [Broadway Cary Corp.], 34 NY2d at 536), but rather a bona fide development, planned thoroughly, whose progress was cut short by the condemnation. As such, the evidence has established that the elements of contiguity, unity of use and unity of ownership have been met and, therefore, the highest and best use of the property is as a single economic unit featuring mixed use development. Therefore, damages should be determined based on diminution of value of the entire property (see generally Matter of County of Suffolk [C. J. Ban Bourgondien, Inc., 47 NY2d at 514).
Because Supreme Court's assessment of damages is based solely on respondent's valuation of the property, involving just the northern parcel, we must first determine, prior to assessing damages, the pretaking value of the entire property. When reviewing a nonjury trial, this Court's authority "to review findings of fact . . . is as broad as that of the trial court" (Matter of Mazur Bros., Inc. v State of New York, 97 AD3d 826, 828 [2012]; see Matter of Mogil v Building Essentials, Inc., 129 AD3d 1378, 1379 [2015]). Accordingly, because the record is sufficiently developed to allow us to value the property as a single economic unit, rather than remit this matter to Supreme Court, we may instead "render the judgment . . . warranted by the facts" (Matter of Mazur Bros., Inc. v State of New York, 97 AD3d at 828 [internal quotation marks and citation omitted]; see Baba-Ali v State of New York, 19 NY3d 627, 640 [2012]; Matter of County of Schenectady [Pahl], 194 AD2d 1004, 1007 [1993], lvs denied 83 NY2d 756 [2004]; 84 NY2d 806 [1994]).
In determining the pretaking value of the property, we are mindful that, "[w]here the parties offer inconsistent highest and best uses and their experts appraise only their own proposed uses, the award must be based upon the evidence offered by the party prevailing on the use question with such adjustments as the evidence will support" (Matter of Oakwood Beach Bluebelt, Stage 1 [City of New York—Yeshivas Ch'San Sofer, Inc.], 164 AD3d 1453, 1457 [2018] [internal quotation marks and citations omitted], lv denied 33 NY3d 903 [2019]; see Matter of City of Long Beach v Sun NLF Ltd. Partnership, 124 AD3d 654, 655-656 [2015], lv denied 26 NY3d 902 [2015]). To that end, Gardner, claimant's expert, appraised the property as having a pretaking value of $33,000 per acre.[FN6] In reaching this determination, Gardner relied on five comparable sales, two of which were also utilized by respondent's expert, Thurston. Because the experts agreed that these sales were comparable to the property, this Court will rely on them when determining the pretaking value.
The first of these comparable sales is for the Walmart parcel, which sold for $42,000 per acre.[FN7] Gardner discounted the sale price 25%, adjusting negatively 15% for parcel size and 10% for zoning. Although these adjustments are supported by the evidence, the record reveals that they are insufficient to account for the differences between the parcels. To that end, although Thurston's appraisal as a whole cannot be used because only the northern parcel was appraised, some individual adjustments are supported by the record, and they will be made accordingly (see Matter of City of New York v Jamaica Arms Hotel, Inc., 14 AD3d 699, 700 [2005]; see also Woehrel v State of New York, 178 AD3d 1169, 1172 [2019]; Matter of County of Schenectady [Pahl], 194 AD2d at 1008). The record supports further discounting Gardner's valuation by 25%. Specifically, Gardner did not negatively adjust for access, which fails to account for the fact that the sole access to the northern parcel is from the small right-of-way, which will need to be extended to reach the northern parcel, and the fact that the secondary access road to Queensbury Boulevard, as discussed above, will need to be built. Therefore, we apply Thurston's negative 10% adjustment, which adequately accounts for extending the right-of-way and the secondary access road. Additionally, we adjust Gardner's valuation negatively 15% for location to account for the fact that the vast majority of the property, unlike the Walmart parcel, does not front the road and is nearly landlocked.[FN8] Accordingly, adjusting the sale price of the Walmart parcel, $42,000, by the negative 50% adjustments, we reach a reconciled sale price of $21,000 per acre.[FN9]
Similarly, both experts also relied on the sale of a neighboring parcel located on Quaker Road, which Gardner lists as having sold for $34,706 per acre.[FN10] Gardner positively adjusted this sale price by 5%, specifically adjusting negative 15% for parcel size, negative 10% for zoning, positive 15% for topography/utility and positive 15% for approvals. With the exception of the adjustments for topography/utility and approvals, Gardner's adjustments are supported by the record. As to topography/utility, Gardner positively adjusted this by 15%, citing to the irregularity of the shape of the parcel, as well as wetlands. However, given the shape and other relevant characteristics of the property, an adjustment of only positive 5% is supported by the record. Also, as to the approvals, which Gardner adjusted positive 15%, the record supports a positive adjustment of only 5%, which is more in line with Thurston's appraisal.[FN11] Additionally, for the same reasons we cited relevant to the Walmart parcel, negative adjustments totaling 25% must be made for both location and access. Thus, adjusting the sale price of this neighboring parcel, $34,706, by the total negative 40% adjustment,[FN12] the reconciled sale price is $20,824 per acre. Averaging the reconciled sales for the Walmart parcel ($21,000 per acre) and the neighboring parcel ($20,824 per acre), we reach a pretaking value of $20,912 per acre, totaling a pretaking value of the entire property (97.48 acres) of $2,038,502.
Now that we have determined the pretaking value, we must calculate the amount of damages due claimant. "[T]he measure of consequential damages in cases involving avigation easements is the diminution of market value, as reflected in the difference in market value before and after the takings" (S.J. & J. Serv. Sta. v State of New York, 74 AD2d 707, 707 [1980], lv dismissed 50 NY2d 927 [1980]). When calculating damages, Supreme Court carefully analyzed the experts' approaches and fully credited the comparable sales approach utilized by Thurston, finding it to be "reasonable and based upon a detailed, logical analysis of the market data derived from sales of similar properties subject to avigation easements." Inasmuch as Thurston's methodology for calculating damages is supported by the evidence, it was within Supreme Court's discretion to credit him (see Hollandale Apts. & Health Club, LLC v Bonesteel, 173 AD3d 55, 63 [2019]; Matter of State of New York [KKS Props., LLC], 119 AD3d at 1037; Matter of Albany County Airport Auth. [Buhrmaster], 265 AD2d 720, 722-723 [1999], lv denied 94 NY2d 758 [2000]), and we defer to that determination (see Schultz v Sayada, 163 AD3d 1218, 1220 [2018]). As relevant to damages, Thurston testified that "[m]aximum building heights generally revolve around 35 feet for most zoning districts statewide" and, "[a]s a practical matter, the ability to construct improvements above 35 feet is insignificant." Bearing this in mind, to determine damages, Thurston calculated a weighted average, based upon the percentage of the property that was impaired according to the varying heights of the avigation easement. Thurston testified that, after applying those percentages, he computed a 26% weighted average, which he then applied to the pretaking valuation of the property, to determine the diminution in value due to the avigation easement. Although there is a sound basis in the record to utilize Thurston's weighted average approach, as well as the specific percentages effecting the property, because Thurston did not factor in the 12.9 acres of the southern parcel, the weighted average must be recomputed for the entire parcel, using the pretaking value of $20,912 per acre, or $2,038,502.
As a threshold matter, there can be no dispute that damages are owed to claimant for the 3.86 acres which were taken, without application of the weighted average, because that property has been 100% appropriated. Applying the value of $20,912 per acre, claimant is owed $80,720 in damages. Next we address the remaining 93.62 acres of the parcel, which has a pretaking value of $1,957,781. In calculating the weighted average, Thurston opined that the avigation easement height restriction between 0 and 15 feet diminishes the value of the property by 75%, that a height restriction between 15 and 35 feet diminishes the value of the property by 60%, and that a height restriction between 35 and 80 feet diminishes the value of the property by 10%. To that we add the 12.9 acres of the southern parcel that are not directly affected by the easement.
As such, we calculate the weighted average to be:



Avigation easement height
Acres
affected
% of site
(93.62 acres total)
Diminishment of property value
Weighted average (% of site x diminishment of value)

0-15 feet
6.05 acres
6.5%
75%
4.88%

15-35 feet
17.99 acres
19.2%
60%
11.52%

35-80 feet
56.68 acres
60.5%
10%
6.05%

Unaffected 
12.90 acres
13.8%
0%
0%




TOTAL:
22.45%






Accordingly, applying the 22.45% diminution in value to the pretaking value of $1,957,781, we assess damages due claimant in the amount of $439,522, plus $80,720 for the 3.86 acres that was appropriated, for a total award of $520,242. Prior payments made to claimant and taxes, penalties and interest actually paid should be deducted from this amount.
Clark, J.P., Mulvey, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is modified, on the law and facts, without costs, by increasing the damages awarded to claimant to $520,242, and, as so modified, affirmed.



Footnotes

Footnote 1: Pursuant to the stipulation and order, a portion of this amount was to be paid directly to respondent's treasurer to satisfy back taxes, as well as penalties and interest, owed by claimant. It is unclear from the record the exact amount that the treasurer received.

Footnote 2: In fact, respondent's appraiser at trial testified that "the fact that you can access [the northern parcel] over a right-of-way across the power line would satisfy [the] criteria" that the parcels be adjoining.

Footnote 3: We note that, during negotiations between Macri and the Town of Queensbury Planning Board regarding this road, Macri stated that if the secondary access road had to be built to Town standards, the project would fail. At trial, he testified that he took that posture as part of the negotiations, but that he "ultimately acquiesced."

Footnote 4: The Town of Queensbury Planning Board minutes from September 2012 memorialize that the Planning Board, despite "reservations," consented to work with Macri on the construction of this access road.

Footnote 5: The requirement of this "secondary access road" was conflated with discussions and testimony concerning another, much longer, "connector road," one that would bridge Quaker Road and Queensbury Boulevard. This connector road was deemed impractical and too expensive. The secondary access road was a completely different topic and involved a road running from the northern parcel across lands owned by respondent, via easement, to a junction at Queensbury Avenue.

Footnote 6: Respondent's expert, who did not appraise the parcels together, set the pretaking value of just the northern parcel at $10,000 per acre.

Footnote 7: Gardner referred this sale as comparable sale number 18 and Thurston referred to it as comparable sale number 3.

Footnote 8: Thurston negatively adjusted 35% for location, but, inasmuch as he did not consider the southern parcel, which, similar to the Walmart parcel, does have road frontage, that adjustment is not fully supported by the record.

Footnote 9: We have also disregarded a minor positive adjustment made by Gardner based upon market trends, which is not supported by the record.

Footnote 10: Gardner referred to this sale as comparable sale number 15 and Thurston referred to is as comparable sale number 1.

Footnote 11: Thurston refers to this category as "engineering" in his comparable sales analysis.

Footnote 12: We have also disregarded a minor negative adjustment made based upon conditions of the sale, which is not supported by the record.